UNITED STATES of America,
Appellee,

v.

Herbert SPERLING et al., Appellants.

Nos. 643, 782, 783, 849, 850, 851, 862, 863, 864, 865, 1071, Dockets 73–2363, 73–2366, 73–2379, 73–2387, 73–2397, 73–2412, 73–2420, 73–2446, 73–2512, 73–2714, 73–2742.

United States Court of Appeals,
Second Circuit.

Argued April 10, 1974.

Decided Oct. 10, 1974.
Certiorari Denied March 3, 1975.
See 95 S.Ct. 1351.

See also, D.C., 362 F.Supp. 909.

1326

Raymond E. LaPorte, Tampa, Fla., for appellant Sperling.

Robert Mitchell, New York City, for appellant Goldstein.

Robert B. Schwartz, New York City (Albert J. Krieger, Alan F. Scribner and Krieger, Fisher, Metzger & Scribner, New York City, on the brief), for appellant Bless.

Alfred Lawrence Toombs, New York City, for appellant Juan Serrano.

Nancy Rosner, New York City, for appellant Bassi.

Joel A. Brenner, Mineola, N.Y. (Howard J. Diller and Diller & Schmukler, New York City, on the brief), for appellant Berger.

Michael A. Young, New York City (William J. Gallagher, The Legal Aid Society, New York City, on the brief), for appellant Frank Serrano.

Victor L. Brizel, New York City, for appellant Valentine.

Allen S. Stim, New York City, for appellant Del Busto.

Stuart R. Shaw, New York City (Roy A. Jacobs and Leavy, Shaw & Horne, New York City, on the brief), for appellant Garcia.

Irving Anolik, New York City, for appellant Schworak.

Lawrence S. Feld, Asst. U. S. Atty., New York City (Paul J. Curran, U. S. Atty., John D. Gordan III, S. Andrew Schaffer and James P. Lavin, Asst. U. S. Attys., New York City, on the brief), for appellee.

**1328**

Before FRIENDLY and TIMBERS, Circuit Judges, and THOMSEN, District Judge.[*]

**TIMBERS, Circuit Judge:**

Appellants Herbert Sperling, Norman Goldstein, Jack Bless,[1] Juan Serrano, Frank Bassi, Jr., Fred Berger, Frank Serrano, Luis Valentine, Octavio Del Busto, Nelson Garcia and Edward Schworak[2] appeal from judgments of conviction entered upon jury verdicts returned in the Southern District of New York on July 12, 1973 after a four week trial before Milton Pollack, *District Judge*,[3] finding all appellants guilty of conspiring to violate the federal narcotics laws in violation of 21 U.S.C. § 846 (1970) (Count One); [4] finding Sperling, Bless, Juan Serrano, Frank Serrano,

[*] Senior United States District Judge of the District of Maryland, sitting by designation.

1. Unless otherwise stated, appellant Jack Bless will be referred to as Bless. When we refer to his brother, Edward Bless, we shall so state. Edward Bless, a co-defendant, was acquitted by the jury. See note 2, *infra*.

Likewise, unless otherwise stated, appellants Herbert Sperling and Frank Bassi, Jr. will be referred to as Sperling and Bassi, respectively, as distinguished from co-defendants Cecile Sperling and Antoinette Bassi who were acquitted by the jury. See note 2, *infra*.

2. In addition to the 11 appellants whose appeals are before us, the indictment named 17 other defendants. Of these, motions for judgments of acquittal were granted as to Salvatore Ruggiero and Sam Kaplan; Susan Weyl and Joseph Conforti pleaded guilty to the conspiracy count (Count One) early in the trial; the cases against Nicholas Cuccinello and Vincent Pacelli, Jr. were severed during the trial; Ben Mallah, Ismael Torres, Peter Salanardi, Courtland Sample, Albert Perez, Al Bracer, Edgardo Ramirez and Jack Spada were unavailable for trial; and Edward Bless, Cecile Sperling and Antoinette Bassi were acquitted by the jury.

3. Appellants were sentenced as follows:

Sperling .............. Life imprisonment on Count 2; 30 years on Counts 1, 8, 9 and 10 (concurrent); 6 years special parole; $100,000 fine on Count 2 and $200,000 fine on all other counts.

Goldstein ............. 8 years on Count 1; 3 years special parole; $25,000 fine.

Bless ................. 10 years on Counts 1, 4, 5 and 6 (concurrent); 3 years special parole; $25,000 fine on all counts.

Juan Serrano ......... 12 years on Counts 1, 7 and 10 (concurrent); 6 years special parole; $50,000 fine on all counts.

Bassi ................. 12 years on Count 1; 6 years special parole; $50,000 fine.

Berger ............... 3 years on Count 1; 3 years special parole; $10,000 fine.

Frank Serrano ....... 5 years on Counts 1 and 3 (concurrent); 6 years special parole; $5,000 fine on both counts.

Valentine ............ 12 years on Counts 1 and 11 (concurrent); 6 years special parole; $50,000 fine on both counts.

Del Busto ............ 5 years on Counts 1 and 11 (concurrent); 3 years special parole; $10,000 fine on both counts.

Garcia ............... 10 years on Counts 1 and 11 (concurrent); 6 years special parole; $25,000 fine on both counts.

Schworak ............ 8 years on Count 1; 3 years special parole; $10,000 fine.

Sperling, Bless, Bassi, Valentine, Del Busto, Garcia and Schworak are serving their sentences. Goldstein, Juan Serrano, Berger and Frank Serrano have been enlarged on bail pending appeal.

4. The conspiracy count (Count One) charged a conspiracy to violate provisions of the Comprehensive Drug Abuse Prevention And Control Act of 1970 (the Drug Control Act of 1970), 21 U.S.C. §§ 812, 841 (a) (1) and 841 (b) (1) (A) (1970). These are the statu-

Valentine, Del Busto and Garcia guilty on substantive counts of distributing and possessing with intent to distribute hard narcotics in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A) (1970) (Counts Three through Eleven);[5] and finding Sperling guilty of engaging in a continuing criminal enterprise involving hard narcotics in violation of 21 U.S.C. § 848 (1970) (Count Two).

Of the numerous claims of error raised on appeal, we find the following to be the principal ones: (1) all appellants claim error with respect to the testimony of co-conspirator Barry Lipsky, the principal government witness; (2) Goldstein, Juan Serrano, Berger, Frank Serrano, Valentine, Del Busto and Garcia claim that there was a material variance between the single conspiracy charged and the multiple conspiracies said to have been proven, and that the evidence was insufficient to support their conspiracy convictions; and (3) Sperling challenges the constitutionality

tory provisions upon which the offenses charged in the substantive counts (Counts Three through Eleven) are based. See note 5, *infra*.

The conspiracy count also charged that the co-conspirators conspired to violate 26 U.S.C. §§ 4705(a) and 7237(b) (1964). These two sections were repealed by the Drug Control Act of 1970, Pub.L.No.91–513 §§ 1101(b)(3)(A), 1101(b)(4)(A), 84 Stat. 1292 (1970). The repealer, which became effective on May 1, 1971, contained a saving provision, § 1103(a), pursuant to which prosecution for any violations of law which occurred prior to the effective date of repeal are not affected by the repeal. See United States v. McCall, 489 F.2d 359, 360 n. 1 (2 Cir. 1973); United States v. Ross, 464 F.2d 376, 378–80 (2 Cir. 1972).

5. The substantive counts (Counts Three through Eleven) each charged distribution and possession with intent to distribute hard narcotics in violation of the above provisions of the Drug Control Act of 1970 as follows:

| COUNTS | DEFENDANTS CHARGED | NARCOTICS INVOLVED | DATES |
|---|---|---|---|
| 3 | *Frank Serrano* * Pacelli | Cocaine (½ kilo) | May 1971 |
| 4 | *Bless* | Cocaine (2 kilos) | August 1971 |
| 5 | *Bless* | Heroin (5 kilos) | September 1971 |
| 6 | *Bless* Edward Bless Pacelli Perez Ramirez Bracer | Heroin (2 kilos) | October 1971 |
| 7 | *Juan Serrano* Pacelli | Cocaine (1 kilo) | August 1971 |
| 8 | *Sperling* Pacelli Mallah | Cocaine (1 kilo) | July 1971 |
| 9 | *Sperling* Pacelli Mallah | Heroin (2 kilos) | November 1971 |
| 10 | *Sperling* *Juan Serrano* Pacelli Mallah | Cocaine (1 kilo) | December 1971 |
| 11 | *Valentine* *Del Busto* *Garcia* | Cocaine (303.5 grams) | November 1971 |

* Names of appellants are italicized.

of 21 U.S.C. § 848 (1970) and claims that there was insufficient evidence to support his conviction on Count Two. Other subordinate claims of error are also raised.

We affirm in part, and reverse and remand for a new trial in part.

## I. OVERALL CONSPIRACY

In view of the issues raised on appeal, we summarize here the essential facts, viewed in the light most favorable to the government, United States v. McCarthy, 473 F.2d 300, 302 (2 Cir. 1972), which showed the nature and scope of a very large, well organized and highly profitable conspiracy from May 1, 1971 to mid-April 1973 among appellants and others to purchase, process and resell hard narcotics. Other more detailed facts necessary to an understanding of our rulings on the legal issues raised will be stated in connection with our discussion of those issues below.

At the hub of the conspiracy were Vincent Pacelli, Jr. and Sperling. Each had at his command the services of others and the sources and outlets for narcotics. Each caused narcotics to be bought, processed and sold. Pacelli had good sources of cocaine; he sold it to Sperling for resale to Sperling's customers. Sperling had good sources of heroin; he sold it to Pacelli for resale to Pacelli's customers. The evidence showed that each of the 11 appellants had a specific role in the conspiracy.

Evidence concerning the Pacelli part of the overall conspiracy was adduced primarily through the testimony of Barry Lipsky, a government witness who was a former participant in the Pacelli operation. Lipsky testified, and his testimony was corroborated by other evidence,[6] that 15 of the defendants and 4 of the co-conspirators named in the indictment were participants in the narcotics operations described by Pacelli.[7] Pacelli received cocaine in kilo or multikilo quantities from Juan Serrano. He received heroin in multikilo quantities from Bless and Sperling. He sold cocaine in kilo and multikilo quantities to Bless, Berger, Valentine, Sperling and Bassi. Bless sold heroin and purchased cocaine from Pacelli. He resold the cocaine to co-conspirator Jack Finkelstein. Valentine purchased cocaine from Pacelli and agreed to travel to South America to obtain drugs on behalf of Pacelli and his partners, Perez and Bracer. Juan Serrano sold cocaine to Pacelli who resold it to Sperling. Garcia and Del Busto received from Valentine cocaine which the latter obtained from Pacelli. The evidence showed the participation of Bassi, Berger and Frank Serrano in the narcotics conspiracy directed by Pacelli. In short, witnesses described approximately 47 meetings, conversations and drug sales or transfers beginning in May 1971 and continuing through December 1971 involving members of the Pacelli group.

Evidence concerning the activities of Sperling and the Sperling branch of the conspiracy was adduced primarily through the testimony of Joseph Conforti, a former member of the conspiracy. Conforti's testimony, corroborated by that of Cecile Mileto and Zelma Vance, established that 13 of the defendants and 2 of the co-conspirators named in the indictment were participants in

---

**6.** In addition to the testimony of Lipsky who was named as a co-conspirator in the indictment, there was accomplice testimony by defendants Conforti and Weyl. Defendants Sperling, Juan Serrano, Berger, Valentine and Pacelli also testified. There was testimony by Jack Finkelstein who had drug transactions with Lipsky and Bless; Cecile Mileto, wife of co-conspirator Louis Mileto; and Zelma Vance, Mileto's girl friend. Police officers testified regarding their visual surveillance of defendants. Photographs and

legally intercepted conversations were received in evidence.

**7.** The following were identified primarily as members of the Pacelli branch of the conspiracy: defendants Pacelli, Bless, Edward Bless, Juan Serrano, Bassi, Antoinette Bassi, Perez, Berger, Bracer, Frank Serrano, Ramirez, Valentine, Del Busto, Garcia and Weyl; and co-conspirators Nicholas Lugo, Peter Aponte, Alberto Gonzalez and Lipsky.

the narcotics operations directed by Sperling.[8] These witnesses described approximately 69 meetings, conversations, drugs sales or transfers beginning in early 1971 and continuing through April 1973 involving members of the Sperling group. As with the Pacelli branch of the conspiracy, each of Sperling's workers had a definite role in the conspiracy, including Goldstein and Schworak who delivered narcotics at Sperling's direction. Sperling supervised and directed the purchase, processing and sale of narcotics within his sphere of control.

## II. LIPSKY TESTIMONY

All appellants claim error with respect to the testimony of Barry Lipsky, the principal government witness. They argue that the court improperly restricted their cross-examination of Lipsky regarding the contents of a letter written by him on December 22, 1972 to Assistant United States Attorney Morvillo (the Lipsky-Morvillo letter); and that they were prejudiced by the failure of the government to make available to them a letter written by Lipsky on December 6, 1972 to Assistant United States Attorney Feffer (the Lipsky-Feffer letter).

Much of the evidence concerning the Sperling-Pacelli narcotics conspiracy was provided by Lipsky. His testimony

was critical because, beginning in April 1971 and continuing until February 1972, he was Pacelli's chief assistant in the latter's narcotics business. He received the narcotics purchased by Pacelli; he stored, tested, diluted and repackaged them for distribution; and he delivered them to Pacelli's customers. He also was present with Pacelli during various narcotics transactions.

### (A) Our Prior Decision In United States v. Pacelli

Before turning to appellants' contentions regarding Lipsky's testimony in the instant case, brief reference should be made to our recent decision in United States v. Pacelli, 491 F.2d 1108 (2 Cir. 1974), which involved testimony by the same government witness Lipsky.

In *Pacelli*, we reversed the conviction of Vincent Pacelli, Jr.[9] of injuring and impeding a witness who had testified before a grand jury and had been subpoenaed by the government as a trial witness in a narcotics case, and also of conspiring with Lipsky to deprive that citizen of her right to be a witness and causing her death. One of the grounds of our reversal and remand for a new trial in *Pacelli* was the government's failure to furnish the defense, as required by the Jencks Act, 18 U.S.C. § 3500 (1970), with the Lipsky-Morvillo letter (the same one referred to above).[10] This let-

---

8. The following were identified primarily as members of the Sperling branch of the conspiracy: defendants Sperling, Mallah, Goldstein, Cuccinello, Torres, Salanardi, Sample, Conforti, Kaplan, Cecile Sperling, Ruggiero, Spada and Schworak; and co-conspirators Louis Mileto and Carlo Lombardi.

9. This is the same Vincent Pacelli, Jr. who was named as a defendant in the instant indictment and whose case was severed during the trial. See note 2, *supra*.

10. Regarding the unavailability of the Lipsky-Morvillo letter for purposes of cross-examination in *Pacelli*, we stated:

"Accepting the government's assertion that these nondisclosures were inadvertent, we cannot agree with its characterization of them as 'harmless error.' Although appellant's counsel possessed an abundance of impeaching material which

he exploited at trial, none of this information conveyed quite so forcefully as Lipsky's letter to Morvillo the desperate state of Lipsky's mind after he had caused a mistrial by perjuring himself in the previous narcotics prosecution against Pacelli. The letter, furthermore, contains a blatant lie to the effect that his perjury, which caused the mistrial, had been unintentional rather than deliberate. Appellant's counsel would probably have sought to make this letter the 'capstone' of his attack on Lipsky's credibility, cf. United States v. Miller, *supra*, and argued that it revealed a frantic—even mentally disturbed—person who was ready to tell any lie to anyone in order to save himself from a murder conviction in the state court. Denial of the opportunity to use such forceful impeaching material bearing on the credibility of the government's key witness

ter described Lipsky's "terrible mental state" for having caused a mistrial by perjuring himself on the witness stand at a previous trial; stated that his main purpose during the past 9½ months had been to *"try my very best* to assist the Government"; and stated that he *"looked forward eagerly* to *testifying* in narcotics cases *for* the Government, *against* Vincent Pacelli, Jr. and others." (emphasis in original) 491 F.2d at 1112. We concluded that the withholding of this letter had impaired cross-examination and had prevented a fair trial.

### (B) *Use Of Lipsky-Morvillo Letter At Trial Of Instant Case*

The Lipsky-Morvillo letter was given to defense counsel at the trial of the instant case. Appellants nevertheless argue that the court unreasonably restricted their cross-examination of Lipsky regarding the letter and erroneously refused to receive it in evidence. While we fail to understand the need for excluding the Morvillo letter altogether, since any portions of it which were irrelevant to the instant proceeding could easily have been deleted, we do not think the ruling was so prejudicial as to require reversal.

■ Lipsky was questioned at length about the letter. He admitted having falsely stated in it that his untruthful answers at the earlier trials were unintentional. He acknowledged having expressed his appreciation to Morvillo for the help he had received in connection with the murder charge against him in Nassau County. There is no claim that the letter differed in any way from what Lipsky said it contained. The exclusion of the letter itself as an exhibit and the restriction of certain cross-examination of Lipsky regarding the letter was well within the discretion of the court. United States v. Miles, 480 F.2d 1215, 1217 (2 Cir. 1973); United States v. Kahn, 472 F.2d 272, 279–82 (2 Cir.), cert. denied, 411 U.S. 982 (1973).[11]

### (C) *Absence Of Lipsky-Feffer Letter At Trial Of Instant Case*

During the trial of the instant case, the government on. four separate occasions represented that a search of its files indicated that all of Lipsky's Section 3500 material had been produced. A few months after imposition of sentences in this case, however, and during still another trial at which Lipsky testified (see United States v. Mallah, 503 F.2d 971 (2 Cir. 1974)), the government produced for the first time the Lipsky-Feffer letter referred to above.

■ Appellants contend that the government's failure to produce this letter for use at the trial of the instant case precluded them from adequately cross-examining Lipsky. They point out that this letter contains new and significant material which could have been used effectively in testing Lipsky's credibility; that it reveals important favors which Lipsky had received from the government in the past and that he hoped for more in the future, none of which was disclosed at the trial; and that the letter, compared with Lipsky's testimony, shows that he tailored his testimony to what he thought the government wanted to hear. Appellants emphasize that Lipsky was the government's key witness and that his testimony was the only incriminating evidence against certain appellants.

■ The issue presented by the absence of the Lipsky-Feffer letter is entirely different from that dealt with above in connection with the Lipsky-Morvillo letter. Clearly the Jencks Act required the government to produce the

mandates a new trial." (footnotes omitted) 491 F.2d at 1119.

11. We likewise find no merit in appellants' argument that the court erroneously excluded from evidence tape recordings of conversations between an Assistant United States Attorney and Lipsky's attorney. The court acted well within its discretion in refusing to admit them in evidence or to permit testimony regarding them. United States v. Kahn, *supra,* 472 F.2d at 279–82.

Feffer letter for use on cross-examination of Lipsky. While the government has previously characterized its failure to produce such important Jencks Act materials in connection with other phases of its prosecution of members of the Sperling and Pacelli organizations as a matter of inadvertence, United States v. Pacelli, *supra,* 491 F.2d at 1119, we feel compelled to admonish that we view such failures in the most serious light. Materials as dramatic as the Morvillo and Feffer letters are not like FBI reports lying around in files which a prosecutor could well forget. Compare United States v. Keogh, 391 F.2d 138, 147 (2 Cir. 1968). While the statement in Giglio v. United States, 405 U.S. 150, 154 (1972), that "the prosecutor's office is an entity" should not be carried too far from the issue of prosecutorial promises there *sub judice,* here Assistant United States Attorney Feffer was still working in that capacity when this case was tried and must have been aware how useful to the defense Lipsky's letter would have been. His failure to make the letter known to the prosecutors at this trial cannot be excused as due to a " 'breakdown in channels of communication.' " *id.*

 Since the government failed to provide significant Jencks Act materials, the test is whether "there was a significant chance that this added item, developed by skilled counsel . . . ., could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Miller, 411 F.2d 825, 832 (2 Cir. 1969). See United States v. Houle, 490 F.2d 167, 171 (2 Cir. 1973), cert. denied, 417 U.S. 970 (1974); United States v. Fried, 486 F.2d 201, 202–03 (2 Cir. 1973), cert. denied, 416 U.S. 983 (1974). In applying that test here, it is incumbent upon us to analyze the letter in an effort to determine its potential usefulness on cross-examination of Lipsky and, in the light of that determination, to attempt to evaluate the impact the letter might have had with respect to the case against each appellant in view of the nature and quantum of evidence against each.

As indicated above, the essence of Lipsky's letter to Feffer was that he thanked Feffer for some of the privileges he had arranged, asked for further favors, and discussed the status of the state murder case pending against Lipsky. This letter could have been of value to appellants in three independent ways.

First, it would have supported the thrust of much of the cross-examination of Lipsky to the effect that his testimony was unreliable. Defense counsel had tried to show that he was under the domination of the government and anxious to please the government in order to obtain certain privileges. As to this, the letter would have been significant because it contained expressions of Lipsky's appreciation for some of the favors for which the government had been responsible in the past—or so Lipsky thought—in return for his cooperation and testimony.[12] These special considerations which Lipsky had received, apparently at the request of the government, reflect at least a rapport between Lipsky and the prosecutor's office.

A second and closely related aspect of the letter which might have been helpful to the defense was Lipsky's request for future favors from the government. For example, he asked Feffer to make arrangements, in the event he were convicted on the state murder charge, so that he would not be required to serve his sentence in a state penitentiary. He also asked Feffer to arrange for a private meeting between Lipsky and his

---

12. Lipsky, who at the time was incarcerated in a state facility awaiting trial on the murder charge, wrote in the letter to Feffer:

"I want you to know I appreciate your efforts in securing for me, the room by myself, the TV, and the radio and all the other special features I enjoy here. Without your help I'd be rotting in a dirty cell with no privileges whatsoever."

girl friend in Feffer's office.[13] At trial, although Lipsky was asked what considerations he expected in return for his testimony, he never specifically mentioned those just stated.

A third aspect of the letter which might have been useful in cross-examining Lipsky was his description of the status of the state murder charge pending against him. At the trial of the instant case, Lipsky had indicated a rather carefree attitude about the state proceeding and a lack of concern as to whether the federal government would intercede on his behalf. On cross-examination, for example, he testified that he may not have asked his lawyer to obtain a reduced plea for him; that he did not really want it because his lawyer thought he would be acquitted. He indicated ignorance of the federal government's role in obtaining a reduced plea of manslaughter. In contrast to his trial testimony, Lipsky stated in his letter to Feffer that the state case against him was "an open and shut case with me the loser"; that the state had approximately "47 witnesses to appear against me"; that the "entire D.A.'s office out here is out for my blood and my life, (which they mean to have)"; that the District Attorney "opposed any conference or plea"; and that his attorney was reduced to "trying to dream up some sort of defense for me in this trial."

In the context of the record in the instant case, however, more than an analysis of the letter in the abstract is required before we can determine whether there was a significant chance that its use at trial could have induced sufficient reasonable doubt in the minds of the jurors to have changed the result of the verdicts.

Cross-examination of Lipsky by 10 defense counsel covers more than 400 pages of the trial transcript. On both direct and cross, he admitted that he had testified falsely before a Florida grand jury in 1970; that he had lied to FBI agents in Florida; that he had been convicted in Miami of conspiracy to transport stolen securities in interstate commerce; that he had lied to the federal judge in Florida who placed him on probation; that he had lied to a Nassau County Assistant District Attorney in 1972; and that at two trials involving Pacelli in the Southern District of New York in June and December of 1972 he had testified falsely about promises that had been made to him. He also admitted that he used cocaine; that he had received promises that he would not be prosecuted for his narcotics activities; that he did not expect to be prosecuted for perjury or tax evasion; that he was hopeful that the federal government would exert its influence in Nassau County to help him receive a lighter sentence on his manslaughter guilty plea; and that he appreciated the help the United States Attorney's office had given in connection with that sentence. Moreover, the jury's attention repeatedly was directed to the Lipsky-Morvillo letter.

Also, in contrast to the situation in *Pacelli*, although Lipsky was the principal witness at the trial of the instant case, other accomplice witnesses also testified. This accomplice testimony was corroborated by an abundance of other independent evidence, including documents, seized drugs, photographs, a tape recording, the results of police surveillance and an undercover investigation, and the testimony of many disinterested witnesses. Furthermore, Lipsky's testimony itself was corroborated here with far more precision than it had been at the *Pacelli* trial.

(D) *Evaluation Of Possible Impact Of Lipsky-Feffer Letter On Cases Against Respective Appellants*

Having in mind the foregoing analysis of the Lipsky-Feffer letter and particularly the context of other impeaching ev-

---

13. From the letter it would appear that Feffer had already arranged for such visits between Lipsky and his mother and brother, and that he indicated to Lipsky that such a visit with his girl friend could be arranged.

idence in which the letter, if available, might have been used to cross-examine Lipsky, we turn now to an evaluation of the impact that the letter might have had with respect to the cases against the respective appellants in view of the nature and quantum of evidence against each.

■ This evaluation relates primarily to the evidence in support of the convictions of all appellants on the conspiracy count, Count One. We find insufficient evidence, other than Lipsky's testimony, to sustain the convictions of any of the appellants for possession and distribution of cocaine and heroin as charged in substantive Counts Three through Ten; indeed, we do not understand the government to claim that there is any evidence to corroborate Lipsky's testimony as to these counts. We therefore reverse and remand for a new trial the convictions of all appellants on substantive Counts Three through Ten.[14]

Accordingly, unless otherwise stated, the following analysis of the impact of the Lipsky-Feffer letter upon the cases against the respective appellants relates to their convictions on the conspiracy count.

### (1) SPERLING, GOLDSTEIN and SCHWORAK

■ Based on our careful review of the evidence introduced against Sperling, Goldstein and Schworak, we are satisfied that, even if the Lipsky-Feffer letter had been available at the time, it would have had no effect whatever upon the jury's verdict as to these appellants on Count One.

Virtually all of the evidence of their participation in the narcotics enterprise was adduced through the testimony of the witnesses Conforti, Mileto and Vance, corroborated by electronic and visual surveillance. Moreover, Sperling's conviction of engaging in a continuing criminal enterprise involving hard narcotics was based on evidence wholly independent of Lipsky's testimony.

These appellants nevertheless advance what we find to be the untenable contention that Lipsky's allegedly *uncorroborated* testimony was the *only* evidence to support their convictions. They claim that Lipsky's testimony was all there was to link the Pacelli and Sperling narcotics operations. This claim misconstrues the evidence. While Lipsky did testify to four specific narcotics transactions between the Pacelli and Sperling groups,[15] his testimony with respect to these four transactions was more than amply corroborated. Furthermore, there was evidence entirely independent of Lipsky's testimony that established the close relationship between the Pacelli and Sperling operations.

For example, Lipsky testified that he and Pacelli frequently went to Ballantine Hair Stylists (Ballantine's) near 54th Street and Seventh Avenue in Man-

---

14. In view of the concurrent sentences on the conspiracy count (Count One) imposed on those appellants whose convictions on the substantive counts we reverse while sustaining these convictions on the conspiracy count (Sperling as to Counts Eight, Nine and Ten; Bless as to Counts Four, Five and Six; and Juan Serrano as to Counts Seven and Ten), we remand the cases of these appellants for reconsideration of sentencing on the conspiracy count—for the same reason as we remand below the cases of Del Busto and Garcia for reconsideration of sentencing them on Count Eleven and with the same admonition that we intimate no view as to the propriety of changing the sentences of the four above named appellants on the conspiracy count.

For the reasons stated below, we affirm the conviction of Sperling of engaging in a continuing criminal enterprise (Count Two) and we affirm the convictions of Valentine, Del Busto and Garcia of possessing and distributing cocaine as charged in substantive Count Eleven.

15. The four transactions were these: (1) Sperling bought one kilo of cocaine from Pacelli in July 1971 (Count Eight); (2) Pacelli bought two kilos of heroin from Sperling in November 1971 (Count Nine); (3) Sperling bought one kilo of cocaine from Pacelli in December 1971 (Count Ten); and (4) Pacelli bought two kilos of heroin from Sperling around Christmas 1971.

hattan. This barbershop was the nerve center of Sperling's operations. It became the focus of intensive police surveillance. Lipsky testified that in November 1971 he and Pacelli drove to 55th Street and Sixth Avenue where Pacelli parked the car and left. When Pacelli returned, he gave Lipsky a parking claim check and a set of car keys. He instructed Lipsky to go to a nearby garage and pick up a late model car, in the trunk of which would be two kilos of heroin. Lipsky was further instructed by Pacelli to drive the car to the "stash", store the drugs there, return the car to the garage, and then meet Pacelli at Ballantine's.

Lipsky testified that he did as he was directed. After picking up the car, he drove to Weyl's apartment which was the "stash". He removed a bag from the car trunk. When he opened the bag in the apartment, he found inside four half-kilo bags of heroin which he put away. He then returned the car and met Pacelli who was engaged in conversation with Sperling. Later that evening, Lipsky obtained $20,000 at Pacelli's request from Pacelli's aunt. Lipsky and Pacelli then drove to Spring Street. Pacelli left the car and returned. He told Lipsky that he had given Sperling $20,000 and that he planned to pay him an additional $14,000 or $16,000 which he owed him.[16]

Lipsky further testified that he participated in another narcotics transaction in December 1971. This involved Pacelli's sale to Sperling of a kilo of cocaine which initially had been purchased from Juan Serrano. According to Lipsky, the events which culminated in this sale began when he and Pacelli drove to a tavern where Pacelli said he was to meet Sperling. Pacelli entered the bar and shortly thereafter returned with $12,000. They drove to Shakespeare Avenue in the Bronx where Pacelli entered Juan Serrano's house. A short time later, Lipsky saw Juan Serrano leave the

house, get into a car and drive away. Within a few minutes, Juan Serrano returned. Pacelli then rejoined Lipsky, removed a large bag from under his coat and told Lipsky to examine it. Pacelli then instructed Lipsky to go to Weyl's apartment, to repackage the cocaine into two bags containing 476 grams each and to store the excess.

After completing this assignment, Lipsky was directed by Pacelli to place the cocaine in the trunk of the same new car that had been used during the previous transactions. The car was parked in the same garage. After doing so, Lipsky returned the keys to Pacelli at Ballantine's. Pacelli gave them to Sperling. That same evening, Pacelli and Lipsky drove to Spring Street where Pacelli collected $4,000 from Sperling. This was Pacelli's profit on the cocaine transaction.[17]

Such testimony showed the interrelationship of the Pacelli and Sperling groups. It was corroborated by other evidence. Susan Weyl, for example, testified that, with her permission, Lipsky and Pacelli used her apartment as a "stash" where they stored heroin and cocaine. She testified that during October and November of 1971 Lipsky from time to time entered her apartment bringing packages of narcotics and that he removed one or more such packages from her apartment.

Pacelli testified that he visited Sperling's apartment on Spring Street and visited Juan Serrano's house on Shakespeare Avenue in December 1971. He met frequently with Sperling at Ballantine's. He also testified that he knew Mileto and Goldstein, two of Sperling's co-workers, and that at his direction Lipsky purchased two savings bonds for Sperling's children, Lipsky using a fictitious name.

Moreover, Sperling testified that he had met with Pacelli on 35 to 40 occasions. He was photographed on at least one of these occasions by police. Juan

---

16. This transaction is the offense charged in Count Nine.

17. This transaction is the offense charged in Count Ten.

Serrano also testified that Pacelli had visited him during this period at his house on Shakespeare Avenue.

Aside from this corroborating testimony, police surveillance confirmed the close relationship between the Pacelli and Sperling groups. On May 8, 1972, for example, Sperling was observed talking with Perez, one of Pacelli's partners, in front of Ballantine's. Standing nearby were Lombardi, one of Sperling's workers, and Ramirez, one of Pacelli's workers. Eventually Sperling left with Perez, Lombardi with Ramirez. Photographs of this meeting were received in evidence.

In short, we are left with the firm conviction that, in view of the substantial, independent and corroborating evidence linking the Pacelli and Sperling narcotics operations, the availability of the Lipsky-Feffer letter for use on cross-examination of Lipsky would not have had any effect on the jury's verdict with respect to the conspiracy convictions of Sperling,[18] Goldstein and Schworak,[19] including their participation in the Pacelli-Sperling conspiracy.

## (2) JUAN SERRANO

Turning to the conspiracy evidence against Juan Serrano, Lipsky testified that he initially was introduced to Juan by Pacelli during the summer of 1971 at the Hippopotamus Discotheque in Manhattan. Pacelli told Lipsky that he had known Juan for a long time. One evening, Juan gave Lipsky a ride home on his motorcycle. About a week later, Pacelli informed Lipsky that they were going to the Bronx to see whether Juan

would supply some cocaine. Pacelli and Lipsky drove to Juan's home on Shakespeare Avenue and purchased cocaine from Juan.

There was corroboration of Lipsky's testimony about this sale and about Juan's role in the conspiracy. Juan testified that he knew Pacelli and Febre who was a member of the Pacelli operation; that he had met with them and Lipsky at the discotheque; and that he had given Lipsky a ride home on his motorcycle on the night referred to in Lipsky's testimony.[20] Juan also testified that Pacelli had visited him at his home in December 1971—a visit confirmed by Pacelli's testimony. Under cross-examination, Juan admitted that he had lied at the time of his arrest when he denied knowing Pacelli. Photographs were received in evidence which linked Pacelli, Febre and Juan Serrano.

We hold, in view of this and other evidence which established Juan Serrano's unmistakable role in the conspiracy, that there was no significant chance that the use of the Lipsky-Feffer letter by skilled defense counsel would have had any effect upon the jury's verdict as to him.

## (3) VALENTINE, DEL BUSTO and GARCIA

We direct our attention next to the evidence against Valentine, Del Busto and Garcia. Lipsky testified that Valentine, who was a friend of Perez and Bracer (both of whom were partners of Pacelli), agreed to travel to South America on behalf of Pacelli to obtain narcotics. While waiting to leave for South America, Valentine per-

---

18. We also hold that Sperling's conviction on Count Two was not affected by the absence of the Lipsky-Feffer letter.

19. We find no merit in Schworak's claim that his Fifth and Sixth Amendment rights were violated because he was compelled to stand trial without the assistance of retained counsel. We hold that the court correctly concluded that Schworak attempted to manipulate his right to counsel for the purpose of delaying and disrupting the trial. See United States ex rel. Davis v. McMann, 386

F.2d 611, 618–19 (2 Cir. 1967), cert. denied, 390 U.S. 958 (1968); United States v. Abbamonte, 348 F.2d 700, 703 (2 Cir. 1965), cert. denied, 382 U.S. 982 (1966); United States v. Bentvena, 319 F.2d 916, 936 (2 Cir.), cert. denied, 385 U.S. 940 (1963).

20. Juan also admitted that he drove a Mercedes automobile for which he paid $8200 in cash. It was this automobile that Lipsky testified Juan used when the latter obtained cocaine in December.

suaded Lipsky to sell him cocaine for resale. On September 28, 1971, at Yellowfingers Cafe, Valentine, Pacelli and Lipsky arranged for the sale of this cocaine. Lipsky had obtained it from a stash and had placed it in a partially damaged 1969 blue Pontiac. The cocaine eventually was transferred to Valentine.

Lipsky's activities in delivering this cocaine to Valentine had been observed by the police. Lipsky's testimony was corroborated by the testimony of officers who had observed the pickup of the Pontiac by Lipsky; the return to Valentine of the car containing cocaine; and Valentine's transfer of the car to co-conspirator Gonzalez.

There was other independent evidence of Valentine's involvement in the narcotics conspiracy when, on October 18, he participated with Gonzalez, Del Busto and Garcia in further transferring this cocaine. Indeed, the evidence of this transfer also indicates that the convictions of Del Busto and Garcia are supported by substantial evidence completely independent of Lipsky's testimony.

▉ On October 18, Officer Crowe of the New York City Police Department observed Valentine enter the Castillian Room Bar & Grill. Parked nearby was the same blue Pontiac. A few minutes later, Del Busto and Garcia left the Castillian Room and went to the car. Garcia opened the trunk, removed a newspaper-wrapped package and handed it to Del Busto who placed it inside the right side of his jacket. Del Busto got into another car and was arrested several blocks away. The newspaper-wrapped package containing 303.5 grams of cocaine was found in his right inside jacket pocket.[21] Meanwhile, Garcia returned to the Castillian Room and left with Valentine and Gonzalez. The three went together to the trunk of the same blue

Pontiac, from which Gonzalez took out a bag containing boric acid. This was found to be the substance used to dilute the cocaine which was seized from Del Busto.

We hold that the convictions of Valentine, Del Busto and Garcia on the conspiracy count, as well as on substantive Count Eleven, are supported by evidence wholly independent of Lipsky's testimony. The Lipsky-Feffer letter, had it been available, would have had no effect upon their convictions.

### (4) BLESS

▉ As for the conspiracy evidence against Bless, Lipsky testified about a number of narcotics transactions between himself and Pacelli on the one hand, and between himself and Bless on the other. He also testified that Bless had told him that he and his brother, Edward Bless, were "partners in the narcotics business". We find that Lipsky's testimony in this respect was corroborated by other evidence.

Lipsky testified that Pacelli instructed him to meet Perez so that they could arrange to obtain two kilos of heroin from Bless. Lipsky did meet Perez. Together they drove to a location where they found Bless, his brother Edward and Ramirez waiting. Lipsky saw Bless give something to Perez. Lipsky then received from Perez a parking claim ticket and a set of car keys. Perez told Lipsky to go to a certain garage; obtain a car which would have two kilos of heroin in the trunk; take the narcotics to the stash (Weyl's apartment); return the car; and then give the keys and another claim check to Pacelli. Lipsky did as directed. He confirmed that the car contained heroin.

Lipsky also testified that during the summer of 1971 he sold two kilos of cocaine to Bless. He obtained the cocaine

---

21. We reject the claim of Del Busto and Garcia that the district court erred in denying their motions to suppress the cocaine seized from Del Busto at the time of his arrest. The arrest of Del Busto on probable cause and the search incidental thereto were proper. Their motions were correctly denied after a full hearing.

from Weyl's apartment and delivered it by the familiar method of transferring a car.

Lipsky's testimony regarding Bless' narcotics transactions and his role in the conspiracy was corroborated, in addition to the foregoing, by significant other evidence. For example, Susan Weyl testified that her apartment was used as a stash and cutting mill at this time. Jack Finkelstein testified that during this period he purchased twenty to thirty kilos of cocaine from Bless and that Bless delivered it himself. Finkelstein further testified that Bless agreed to accept the return of two kilos of cocaine which he had sold to Finkelstein; and that Bless sent Lipsky to Finkelstein's apartment to pick up the cocaine to be returned.

This and other evidence adequately corroborated Lipsky's testimony regarding Bless' role in the conspiracy.[22] We hold that there was no significant likelihood that the Lipsky-Feffer letter would have affected the jury's verdict as to Bless.

### (5) BASSI, BERGER and FRANK SERRANO

We come finally to the conspiracy evidence against Bassi, Berger and Frank Serrano. We find that the evidence against these three, compared with that against the other eight, is on quite a different footing from the standpoint of the impact that the Lipsky-Feffer letter might have had if it had been available to cross-examine Lipsky.

For example, while there was corroboration for Lipsky's testimony that Bassi's apartment was a stash for some Pacelli-Sperling narcotics transactions, there also was evidence sharply disputing his testimony that he attempted to deliver cocaine to Bassi on Christmas

Day in 1971. Such contradicting testimony came from Bassi's brother, Edward Bassi, and from the sister of Bassi's wife.

As for Berger, Lipsky's testimony linking him to the conspiracy was uncorroborated except for the evidence that Berger went to Spain for an ambiguous purpose.

And the only evidence that Frank Serrano was a narcotics dealer was the uncorroborated testimony of Lipsky.

In view of the nature and quantum of the conspiracy evidence against these three appellants, we cannot say that the Lipsky-Feffer letter, had it been available, would not have affected their convictions.

### (E) Summary Of Impact Of Lipsky-Feffer Letter On Cases Against Respective Appellants

With respect to the conspiracy convictions of Sperling, Goldstein, Schworak, Juan Serrano, Valentine, Del Busto, Garcia and Bless, we hold that there was no significant chance that the Lipsky-Feffer letter, had it been available, "could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Miller, supra, 411 F.2d at 832. This conclusion is based upon our careful examination of the entire record of more than 4000 pages; and it is based upon our evaluation and balancing, among other things, of the enormous amount of other material that was available and used to impeach Lipsky, the extensive cross-examination of him by defense counsel, and the substantial evidence that corroborated his testimony. See United States v. Pfingst, 490 F.2d 262, 276–78 (2 Cir. 1973), cert. denied, 417 U.S. 919 (1974); United States v. Kahn, 472 F.2d 272, 287–88 (2 Cir. 1973). We therefore af-

---

22. We also hold that Bless was not prejudiced within the meaning of Bruton v. United States, 391 U.S. 123 (1968), by the admission of a stipulation between his brother, Edward Bless, and the government which was read to the jury. The cautionary instructions given by the court were adequate to protect Bless' rights. United States ex rel. Nelson v. Follette, 430 F.2d 1055, 1059 (2 Cir. 1970), cert. denied, 401 U.S. 917 (1971); United States v. Cusumano, 429 F.2d 378, 381 (2 Cir.), cert. denied, 400 U.S. 830 (1970).

firm the conspiracy convictions of Sperling, Goldstein, Schworak, Juan Serrano, Valentine and Bless. For the reasons stated below under Section III, however, we reverse the conspiracy convictions of Del Busto and Garcia on other grounds.

With respect to Bassi, Berger and Frank Serrano, however, application of the same test leads us to the conclusion that the Lipsky-Feffer letter, had it been available, might well have affected the jury's verdict as to them. We therefore reverse their conspiracy convictions [23] and remand their cases for a new trial.

### III. SINGLE CONSPIRACY

Goldstein, Juan Serrano, Valentine, Del Busto and Garcia [24] claim that there was a material variance between the single conspiracy charged in the indictment and the multiple conspiracies said to have been proven; that the court improperly instructed the jury on the single conspiracy issue; that the court abused its discretion in denying their motions for severance; and that, even if there was proof of a single conspiracy, the evidence was insufficient to support their conspiracy convictions.

 With respect to the claim of variance, we hold that the evidence clearly established the existence of one large conspiracy to distribute enormous amounts of heroin and cocaine for profit. The common aim and ultimate purpose of the conspiracy was "the placing of the forbidden commodity into the hands of the ultimate purchaser." United States v. Agueci, 310 F.2d 817, 826 (2 Cir. 1962), cert. denied, 372 U.S. 959 (1963). There was abundant evidence that Pacelli and Sperling joined together in an integrated loose-knit combination, United States v. Bynum, 485 F.2d 490, 495 (2 Cir. 1973), vacated and remanded

on other grounds, 417 U.S. 903 (1974), to purchase and sell large quantities of heroin and cocaine at a profit. At the core of this joint combination were Sperling and his partner, Mallah, as well as Pacelli and his partners, Perez and Bracer. Substantial trial testimony, corroborated by visual surveillance, amply proved an integrated and continuing conspiracy between the Pacelli and Sperling groups. Each acted as customer and supplier of the other. The fact that not each of the conspirators was acquainted with each of the others is of no significance, since "there is evidence that each was aware of others in the line of distribution and of the larger nature of the operation in which he . . . played a part." United States v. Calabro, 467 F.2d 973, 982–83 (2 Cir. 1972), cert. denied, 410 U.S. 926 (1973). See United States v. Sisca, 503 F.2d 1337, 1345 (2 Cir. 1974), cert. denied, —— U.S. —— (1974); United States v. Bynum, *supra,* 485 F.2d at 496.

In view of the frequency with which the single conspiracy vs. multiple conspiracies claim is being raised on appeals before this court, see United States v. Rizzo, 491 F.2d 1235 (2 Cir. 1974); United States v. DeMarco, 488 F.2d 828 (2 Cir. 1973); United States v. Mapp, 476 F.2d 67 (2 Cir. 1973), we take this occasion to caution the government with respect to future prosecutions that it may be unnecessarily exposing itself to reversal by continuing the indictment format reflected in this case. While it is obviously impractical and inefficient for the government to try conspiracy cases one defendant at a time, it has become all too common for the government to bring indictments against a dozen or more defendants and endeavor to force as many of them as possible to trial in the same proceeding on the claim of a single conspiracy when

---

23. As stated above, we reverse the convictions of Bassi, Berger and Frank Serrano on the conspiracy count (Count One), and we reverse the conviction of Frank Serrano on the only substantive count upon which he was convicted (Count Three).

24. Berger and Frank Serrano also assert this claim. In view of our reversal of their conspiracy convictions because of the absence of the Lipsky-Feffer letter, there is no need to consider their claim here.

the criminal acts could be more reasonably regarded as two or more conspiracies, perhaps with a link at the top. Little time was saved by the government's having prosecuted the offenses here involved in one rather than two conspiracy trials.[25] On the contrary, many serious problems were created at the trial level, including the inevitable debate about the single conspiracy charge, which can prove seriously detrimental to the government itself. We have already alluded to our problems at the appellate level, where we have had to comb through a voluminous record to give adequate consideration to the claims of eleven separate appellants.[26]

██ We hold that Judge Pollack's charge on this issue clearly was appropriate and not contrary to our decision in United States v. Borelli, 336 F.2d 376, 386 (2 Cir. 1964), cert. denied, 379 U.S. 960 (1965). He properly marshalled the evidence; explained in detail the essential elements of the crime of conspiracy; focused the jury's attention on the importance of their determining whether each defendant joined the conspiracy

and the scope of his agreement; and specifically charged that if the government "has failed to prove the existence of only one conspiracy, you must find the defendants not guilty." This instruction was proper—"indeed, if anything, more favorable to appellants than that to which they were entitled." United States v. Sisca, *supra*, 503 F.2d at 1345. See United States v. Calabro, 449 F.2d 885, 893–94 (2 Cir. 1971), cert. denied, 405 U.S. 928 (1972); United States v. Aiken, 373 F.2d 294, 299 (2 Cir.), cert. denied, 389 U.S. 833 (1967). Assuming arguendo that the evidence did show more than one conspiracy, there was no prejudice to appellants sufficient to warrant reversal under the rule stated in United States v. Agueci, *supra*, 310 F.2d at 827. See United States v. Calabro, *supra*, 467 F.2d at 983.

██ We would like to note, however, that the charge based on Pinkerton v. United States, 328 U.S. 640, 645 (1946), here given to the jury by Judge Pollack,[27] should not be given as a matter of course. While no appellants in

---

25. The government has emphasized the admittedly symbiotic aspects of the relationship between the Pacelli and Sperling organizations in an effort to justify its decision to try the members of both groups together. While there is clear evidence of drug sales between Pacelli and Sperling, the ties among the members of each group were much stronger than the ties between the two organizations. It would have been much wiser for the government to have tried the appellants in two separate actions, one incorporating those linked with the Pacelli group and the other incorporating those linked with Sperling. Except for Lipsky, there was no common witness against members of both groups.

26. The one saving virtue here was the highly competent manner in which Judge Pollack handled this case from beginning to end—something we have come to expect from him.

27. Judge Pollack charged the jury as follows:
"I have reviewed with you the elements of substantive counts which the government must prove beyond a reasonable doubt before the defendants would be guilty.

There is, furthermore, another method by which you should evaluate the possible guilt of each defendant and which would sustain his guilt on the substantive counts even though the government's proof was not sufficient to establish all the required elements as to him. I have already instructed you as to the crime of conspiracy for which the defendants l ere are charged in the first count.

Now, if you find pursuant to those instructions that a particular defendant was a conspirator and hence guilty under the first count, you may find him guilty as well under a substantive count in the indictment, providing you find as to such count the following: you must find that the crime charged in the substantive count was committed and that it was committed during and in furtherance of the conspiracy charged in the first count. If you find this to be a fact, then each and every member of the conspiracy, just like a partner, is criminally responsible for the substantive crime and may be found guilty thereof. The reason for this is that a co-conspirator committing a substantive crime would in that case be an agent of the other members of the conspiracy."

this case were prejudiced by the charge,[28] it was used here in circumstances quite different from those that gave it birth. In the *Pinkerton* case, there was no evidence that Daniel Pinkerton had committed the substantive offense for which he had been convicted, but it was clear that the offense had been committed and that it had been committed in furtherance of an unlawful conspiracy of which he was a member. Daniel's conviction on the substantive count was sustained because "in the law of conspiracy . . . the overt act of one partner in crime is attributable to all." *Id.* at 647. In this case, however, the inverse is at work. The evidence of various substantive offenses, many discrete instances of which are charged to individual appellants in Counts Two through Eleven, was great; it was the conspiracy that in some instances must be inferred largely from the series of criminal offenses committed.

We hold that appellants' claim that the court abused its discretion in denying their motions for severance is without merit. In view of the more than adequate evidence of the existence of a single conspiracy, the court did not abuse its discretion in denying the motions for severance. United States v. Bynum, *supra,* 485 F.2d at 497–98; United States v. Cassino, 467 F.2d 610, 622–23 (2 Cir. 1972), cert. denied, 410 U.S. 928 (1973); United States v. Fantuzzi, 463 F.2d 683, 687 (2 Cir. 1972).

Finally, we turn to the claim that, assuming the evidence established a single conspiracy, there was insufficient evidence from which the jury could have concluded that appellants were aware that the scope of the conspiracy was larger than their participation as respective individuals. As to appellants Goldstein, Juan Serrano and Valentine, we hold that their claims in this respect are frivolous. There was overwhelming proof that these appellants were deeply involved in this large scale narcotics conspiracy and were well aware of its

scope. United States v. Arroyo, 494 F.2d 1316, 1319 (2 Cir. 1974); United States v. Bynum, *supra,* 485 F.2d at 496–97, 498–99.

On the other hand, the claims of appellants Del Busto and Garcia are on a different footing. As to them, the government relies upon the single act doctrine in urging that there was sufficient evidence to support their conspiracy convictions. We disagree. "For a single act to be sufficient to draw an actor within the ambit of a conspiracy to violate the federal narcotics laws, there must be independent evidence tending to prove that the defendant in question had some knowledge of the broader conspiracy, or the single act itself must be one from which such knowledge may be inferred." United States v. De Noia, 451 F.2d 979, 981 (2 Cir. 1971), citing United States v. Agueci, *supra,* 310 F.2d at 836, and United States v. Aviles, 274 F.2d 179, 189 (2 Cir.), cert. denied, 362 U.S. 974 (1960). Here, the narcotics transaction of October 18, 1971 involving Valentine, Del Busto, Garcia and Gonzalez we believe is insufficient to link Del Busto and Garcia to the larger conspiracy. Garcia's mere delivery of cocaine to Del Busto, under all the circumstances, is not the kind of single transaction which itself supports an inference of knowledge of a broader conspiracy on the part of both participants. United States v. De Noia, *supra,* 451 F.2d at 981, and authorities there cited.

This does not end our inquiry as to the judgments of conviction of Del Busto and Garcia. Assuming the insufficiency of the evidence to support their convictions on the conspiracy count, we nevertheless hold that they were not prejudiced by the submission of that count to the jury. As we have held above, there was overwhelming evidence to support their convictions on Count Eleven, the substantive count which charged them with distributing and possessing with intent to distribute 303.5

---

28. See note 29, *infra.*

grams of cocaine. Since they were not prejudiced by a "spill over" of the evidence from the submission of the conspiracy count to the jury, United States v. Gaines, 460 F.2d 177, 178–80 (2 Cir. 1972); United States v. Adcock, 447 F.2d 1337, 1339 (2 Cir.), cert. denied, 404 U.S. 939 (1971), we hold that the valid convictions on the substantive count (Count Eleven) provide an adequate basis upon which to affirm the judgments of conviction of both Del Busto and Garcia on that count. United States v. De Noia, *supra*, 451 F.2d at 981; United States v. Coppola, 424 F.2d 991, 994–95 (2 Cir.), cert. denied, 399 U.S. 928 (1970); United States v. Tropiano, 418 F.2d 1069, 1083 (2 Cir. 1969), cert. denied, 397 U.S. 1021 (1970); United States v. Marino, 396 F.2d 780, 781 (2 Cir. 1968); United States v. Agueci, *supra*, 310 F.2d at 828.

 Since Del Busto and Garcia received concurrent sentences on the two counts and since the fact of conviction on both counts might have affected the sentences imposed for each, we remand for reconsideration of sentencing. See United States v. Rizzo, 491 F.2d 1235, 1236 (2 Cir. 1974); United States v. DeMarco, 488 F.2d 828, 833 (2 Cir. 1973); United States v. Mancuso, 485 F.2d 275, 283 (2 Cir. 1973); United States v. Mapp. 476 F.2d 67, 83 (2 Cir. 1973); United States v. Hines, 256 F.2d 561, 564 (2 Cir. 1958). Cf. United States v. Febre, 425 F.2d 107, 113

(2 Cir.), cert. denied, 400 U.S. 849 (1970). In so doing, however, we intimate no view as to the propriety of changing the sentences on the substantive counts. In short, as to Del Busto and Garcia, we reverse their convictions on Count One, affirm their convictions on Count Eleven, and remand for reconsideration of sentencing on the latter count.[29]

## IV. CONTINUING CRIMINAL ENTERPRISE

Sperling was convicted on Count Two of engaging in a continuing criminal enterprise involving hard narcotics in violation of 21 U.S.C. § 848 (1970). He claims that his conviction on this count should be reversed chiefly on the grounds that § 848 is unconstitutional; that the evidence was insufficient to support the conviction; and that the indictment was legally deficient.[30]

 Sperling's claim that the continuing criminal enterprise provision of § 848 on its face is void for vagueness is foreclosed by our decisions in United States v. Sisca, *supra*, 503 F.2d at 1345, and United States v. Manfredi, 488 F.2d 588, 602–03 (2 Cir. 1973), cert. denied, 417 U.S. 936 (1974). We also reject his claims that the statute is unconstitutional as applied to him, that the evidence was insufficient to support his conviction under the statute and that the indictment was legally deficient.

29. We also reject the claim of Garcia and Del Busto that, since the evidence against them was insufficient on the conspiracy count, the court's giving the so-called Pinkerton charge, based on Pinkerton v. United States, *supra*, 328 U.S. at 645, requires a new trial. While use of the Pinkerton charge might better have been avoided in this case, in view of the overwhelming evidence in support of their convictions on the substantive counts we hold that neither Garcia nor Del Busto was prejudiced by that charge. Compare United States v. Cantone, 426 F.2d 902, 904–05 (2 Cir.), cert. denied, 400 U.S. 827 (1970), heavily relied upon by the appellants. *Cantone*, however, holds

that, where there is no direct proof that a defendant committed a substantive offense for which he is charged *and* where there is insufficient proof he was a member of the conspiracy in furtherance of which the substantive offense was committed, it is error to give the Pinkerton charge as a means of obtaining a conviction on the substantive count. Here direct proof existed.

30. We find no error in the denial of Sperling's motion for a new trial which alleged errors in more than fifty rulings of the district court. United States v. Sperling, 362 F.Supp. 909 (S.D.N.Y.1973).

To establish a violation of § 848, it was incumbent upon the government to prove that Sperling occupied a position as organizer or a managerial or supervisory position with respect to a continuing narcotics trafficking operation in concert with five or more other persons, and that he received substantial income or resources from the operation.

The record shows that Sperling was the operational kingpin of a highly organized, structured and on-going narcotics network. Testimony by Conforti, Cecile Mileto and Vance, as well as visual and electronic surveillance, clearly established that during the period from May 1, 1971 through April 13, 1973 Conforti, Louis Mileto, Goldstein, Schworak, Spada and many others were engaged in Sperling's narcotics enterprise directly under his supervision. There was evidence that on more than 26 occasions some or all of these individuals mixed heroin for Sperling. Each of these mixing sessions involved possession, diluting and distributing from a half kilo to three kilos of pure heroin. Such evidence was more than sufficient to sustain his conviction under this count.[31]

Sperling further argues that the evidence was insufficient to convict him under § 848 because it failed to show that five or more people were working in his narcotics business at the same moment. This argument misconstrues the statute. No such proof is required. As to this element of the offense, the statute requires only that the person charged must have been acting "in concert with five or more other persons" and as to them that he occupied "a position of organizer, a supervisory position, or any other position of management".

In like vein, Sperling's claim that the indictment was legally deficient is little short of fatuous. He asserts that Count Two was defective because it failed to specify the names of the persons with whom he acted in concert and as to whom he occupied a position of organizer, and because it failed to specify each violation constituting the continuing series of violations proscribed by the statute. These contentions are wholly devoid of merit. Count Two tracks the statutory language. It contains every element of the offense charged. It satisfies the requirement that a defendant be given notice of the charges against him so that he can prepare his defense and plead the judgment in bar of any future prosecution for the same offense. United States v. Salazar, 485 F.2d 1272, 1277 (2 Cir. 1973). Moreover, Sperling was provided with a bill of particulars which identified eight persons as to whom he occupied a position of organizer, supervisor or manager.

In short, we reaffirm that § 848 is aimed at "the business of trafficking in the prohibited drugs on a continuing, serious, widespread, supervisory and substantial basis." United States v. Manfredi, supra, 488 F.2d at 602. The indictment as amplified by the bill of particulars made it crystal clear to Sperling that this was the nature of the govern-

31. We find no merit in Sperling's claim that the court erred in denying his motion to suppress certain overheard conversations. His right to privacy was not violated wʰen a police officer who was in the trunk of a car overheard two of his conversations while he was standing nearby on the public sidewalk. United States v. Ortega, 471 F.2d 1350, 1361 (2 Cir. 1972), cert. denied, 411 U.S. 948 (1973). Nor were his Fourth Amendment rights violated by the admission in evidence of another of his conversations which had been recorded by means of a valid court-authorized listening device installed in a mailbox. United States v. Manfredi, supra, 488 F.2d at 597; United States v. Tortorello, 480 F.2d 764, 771–75 (2 Cir.), cert. denied, 414 U.S. 866 (1973). Finally, the warrantless search of Sperling's automobile was not in violation of the Fourth Amendment. United States v. Robinson, 414 U.S. 218 (1973); Adams v. Williams, 407 U.S. 143 (1972).

ment's case and afforded him an opportunity fairly and adequately to prepare his defense. His conviction on Count Two is affirmed.[32]

We have considered appellants' other claims of error and find them without merit.

■ To summarize:

On Count One, we affirm the convictions of appellants Sperling, Goldstein, Bless, Juan Serrano, Valentine and Schworak; we reverse and remand for a new trial the convictions of appellants Bassi, Berger and Frank Serrano, and we reverse the convictions of appellants Del Busto and Garcia.[33]

On Count Two, we affirm the conviction of appellant Sperling.

On Counts Three through Ten, we reverse and remand for a new trial the convictions of appellants Sperling, Bless, Juan Serrano and Frank Serrano to the extent they were convicted on those counts.

On Count Eleven, we affirm the convictions of appellants Valentine, Del Busto and Garcia.

32. In affirming Sperling's conviction on Count Two, we also reject as frivolous his claims that his cross-examination was improper, that his sentencing was constitutionally defective and that the court improperly instructed the jury.

33. When this opinion was in its final stages of preparation, the United States Attorney notified us that Garcia had escaped and moved for dismissal of his appeal. We granted this motion ·and filed the following order on October 9, 1974:

"It is hereby ordered that the motion made herein by counsel for the appellee United States of America by a letter dated September 27, 1974 to dismiss the appeal of appellant Nelson Garcia (Docket No. 73–2714) because of his escape from federal custody be and it hereby is granted unless counsel for Garcia notifies the Clerk of the Court within thirty (30) days of the date of this order that Garcia has

been returned to custody. Molinaro v. New Jersey, 396 U.S. 365 (1970) ; Brinlee v. United States, 483 F.2d 925 (8 Cir. 1973) ; United States v. O'Neal, 453 F.2d 344 (10 Cir. 1972) ; Johnson v. Laird, 432 F.2d 77 (9 Cir. 1970) ; Stern v. United States, 249 F.2d 720 (2 Cir. 1957), cert. denied, 357 U.S. 919 (1958)."

Unless the Clerk of this Court is advised by Garcia's counsel within thirty days of the filing of the above order that Garcia has been returned to federal custody, instead of the reversal of Garcia's conspiracy conviction and the affirmance of his conviction on Count Eleven here provided, his appeal will be dismissed with prejudice.

[Garcia's counsel having failed to notify the Court of Garcia's return to custody within 30 days of the above order, and Garcia in fact not having returned to custody, a judgment was entered on November 11, 1974 dismissing Garcia's appeal.]