**UNITED STATES of America,**
**Appellee,**

v.

**Pedro MORELL and Ramon Bruzon, Appellants.**

**Nos. 1217, 1218, Dockets 74–1827, 75–1200.**

United States Court of Appeals, Second Circuit.

Argued July 15, 1975.

Decided Aug. 29, 1975.

Barry I. Slotnick, New York City (Slotnick & Narral, New York City, of counsel), for appellant Morell.

George L. Santangelo, New York City (Santangelo & Santangelo, New York City, of counsel), for appellant Bruzon.

Paul B. Bergman, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., Alvin A. Schall, Carol B. Amon, Asst. U. S. Attys., of counsel), for appellee.

Before MOORE, FRIENDLY and Van GRAAFEILAND, Circuit Judges.

MOORE, Circuit Judge:

Pedro Morell and Ramon Bruzon were convicted by a jury of conspiracy to distribute cocaine and of possession of cocaine with intent to distribute.[1] 21 U.S.C. §§ 841(a)(1), 846. The principal government witness at their joint trial was Alfredo Valdez, a government informant who had been arrested in Miami in December 1969 for possession of cocaine. Valdez pleaded guilty in 1970, although he was not sentenced until two years later, when the United States District Court for the Southern District of Florida imposed three years of probation. Following his plea, Valdez began working as an informant for the Bureau of Narcotics and Dangerous Drugs. Between 1970 and 1972, when the events in this case transpired, Valdez worked with the government in several drug cases that resulted in arrests and convictions, and after May 1972 he continued to cooperate with the government until he returned to Central America, where he was residing at the time of this trial.

Valdez testified that in April 1972 a man named "Louie" introduced him to Morell and Bruzon as "two guys" in the cocaine business. "Louie", it turns out, was actually an undercover government informant. Bruzon and Morell told Valdez that they were expecting a shipment of cocaine to arrive shortly from Columbia. They gave Valdez the address of a store in Queens where they kept supplies used in their painting business. Over the course of the next few weeks Valdez visited the store four or five times, and Bruzon and Morell were present on each occasion.

On May 23, 1972, Bruzon called Valdez and told him that the cocaine had arrived. They met on the evening of May

---

1. Bruzon and Morell were tried from March 5 to March 7, 1974. An earlier trial had ended in a mistrial on March 4 after it was discovered that some of the jurors had read a newspaper article about the government's use of informers.

24, and tentatively agreed on a sale of four kilos at a price of $12,000 per kilo. At about 1:00 A.M. on May 25, Valdez met Morell, who approved the price. They also agreed to meet at the store between 4:00 P.M. and 6:00 P.M. that day to consummate the deal.

At 2:00 P.M. Valdez met Agent McElroy of the BNDD, with whom Valdez had maintained regular contact, and told McElroy the details of the proposed deal. Shortly thereafter, agents supplied Valdez with $48,000 in government funds, which were placed in the trunk of Valdez' car. It was agreed that when Valdez came out of the store and removed the money, it would signify to observing agents that he had seen the cocaine.

Valdez arrived at the store at 4:20 P.M. He was greeted by Morell who took him to the basement where Bruzon was cutting the cocaine and mixing it with dextrose. Valdez and Morell left the store, and Valdez went to his parked car and removed the money from the trunk—the signal that he had seen the cocaine. Morell and Valdez were followed back into the store by agents, who arrested Morell and pretended to arrest Valdez. Valdez said "God damn", a prearranged signal that the cocaine was in the basement. Agent Jeffrey Scharlatt went down to the basement. He observed Bruzon exiting through a back door where agents stationed at the back of the store effected the arrest. On his way back upstairs, Scharlatt saw plastic bags containing white powder on the floor. The bags were seized and on analysis were found to contain cocaine.

In addition to presenting character witnesses, both Bruzon and Morell took the stand in their own defense. They testified that they rented part of the store from Urbano Ramos, assertedly a friend of Valdez who operated a fruit stand on the premises. Their story was that Valdez had come to the store on May 25 looking for Ramos, who was not there. The inference they sought to have the jury draw from their story was that Valdez and/or Ramos were dealing in cocaine and had placed it in the store without knowledge of Bruzon or Morell. According to them, they were innocent of any cocaine dealing, and Valdez had set up their arrest by BNDD agents in order to improve his record as an informant.

I.

On September 29, 1972, the appellants made a written motion that included a request for "information which is favorable to the defense . . . , including matters which might or could motivate testimony by persons whom the Government intends to call during the course of the trial, including acts of misconduct committed by said persons. . . ." (A.7–8) The government consented to this application, but no documentary material relating to Valdez was made available to the defense. Then during Morell's and Bruzon's first trial, which resulted in a mistrial, the government brought out on direct examination the fact of Valdez' 1970 guilty plea in Florida for possession of cocaine, his sentence to probation, and his work for the government as a paid informant. Defense counsel also cross-examined Valdez on these matters.

Prior to the second trial, the defense made a more specific request for information relating to "the arrest record of Valdez, . . . the deal in Florida, [and] his deal with McElroy, the agent. . . ." (A.288). The Assistant United States Attorney in charge of the case responded: "I made total disclosure of anything to do with his testimony. I turned over all 3500 materials. His arrest, his life was brought in front of the jury. We have no arrest record in our possession and the incident took place two years ago." As a consequence, no additional material was turned over by the government.

This appeal was scheduled to be argued during the week of December 16, 1974. In a letter to this court dated December 11, 1974, the United States Attorney's office disclosed that in preparing the appeal, it had for the first time discovered the existence of a confi-

dential file (consisting of two folders) relating to Valdez that were in the possession of the Drug Enforcement Administration. This court then entered an order remanding the case "to the district court with instructions to make appropriate findings of fact and conclusions of law with respect to the disclosures made by the government in its letter dated December 11, 1974 . . .." Shortly thereafter, the government made available to defense counsel and the district court redacted versions of the confidential file.[2] Also furnished were an order of the United States District Court for the Southern District of Florida, dated July 16, 1973, terminating Valdez' three year period of probation, which had begun in May 1972, after fourteen months, and a transcript of Valdez' sentencing hearing.

The additional material turned over revealed the following facts unknown to the defense at the time of trial and deemed by the appellants to be pertinent: (1) that Valdez was sentenced to three years probation on May 18, 1972, only a week before the arrests in this case, and not in 1970 or 1971 as Valdez had indicated at trial;[3] (2) that the district court in Florida apparently conditioned Valdez' probation on continued cooperation with the government; (3) that Valdez' *modus operandi* differed in this case from others on which he had worked in that in all previous cases Valdez had introduced undercover agents to drug dealers; (4) that in April 1973, the Drug Enforcement Administration had interceded with the Immigration and Naturalization Service to have Valdez' wife, an illegal alien, remain in this country until the cases on which Valdez worked were concluded; and (5) that the Drug Enforcement Administration had acted through the United States Attorney's office in Florida to obtain an early termination of Valdez' probation.

2. As requested by defense counsel, we have reviewed the confidential file in its entirety and have found no information favorable to the appellants other than what was turned over by the government.

The district court did not hold an evidentiary hearing on the failure of the government to turn over these materials earlier. The court did receive letters from the parties on the effect of the material and whether a new trial should be ordered. It also heard oral argument on the matter.

■ The district court was fully aware of decisions of this court elaborating on the propriety of granting a new trial when the government failed to disclose, as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the existence of favorable evidence material to guilt or punishment. The standards governing the grant of a new trial vary according to the extent of the government's culpability. If the prosecutor has intentionally suppressed evidence or ignored evidence whose high value to the defense could not have escaped his attention, a new trial is warranted if the evidence is merely material or favorable to the defense. *E. g., United States v. Kahn,* 472 F.2d 272, 287 (2d Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1972); *United States v. Keogh,* 391 F.2d 138, 146–47 (2d Cir. 1968). If, on the other hand, the government's failure to disclose is merely inadvertent or negligent, a new trial is required only if there is a "significant chance that this added item, developed by skilled counsel as it would have been could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Rosner,* 516 F.2d 269, 272 (2d Cir. 1975); *United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir. 1975); *Grant v. Alldredge,* 498 F.2d 376, 380 (2d Cir. 1974); *United States v. Miller,* 411 F.2d 825, 832 (2d Cir. 1969). However, the district court did not make a determination regarding the government's conduct. It stated that a new trial should be denied regardless of the standard applied.

3. The trial transcript does not indicate that Valdez' testimony on this point was intentionally false. Valdez expressed uncertainty about his sentencing date and only when pressed by defense counsel stated that he thought the sentence was imposed about a year after his plea. (A.356–57).

We cannot accept this assessment. First of all, the material was unquestionably favorable to the defense insofar as it bore on the testimony of Valdez. Surely the defense would have liked to have known that Valdez was sentenced only seven days before the arrests, that the BNDD had requested a suspended sentence, and that the probation had been conditioned on continued cooperation with the government. Such evidence might have bolstered the defense theory that Valdez had set up Morell and Bruzon to solidify his record as an informant. Likewise the intercession of the BNDD on behalf of Valdez' wife and the early termination of his probation were pertinent to the extent of Valdez' reward for cooperation, and any sense of gratitude he may have felt toward the government.

Furthermore, our cases establish that in cases of deliberate suppression, "prophylactic considerations", designed to deter future prosecutorial misconduct are of overriding importance. *Grant v. Alldredge, supra,* 498 F.2d at 381; *United States v. Pfingst,* 490 F.2d 262, 277 (2d Cir. 1973), *cert. denied,* 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); *United States v. Keogh, supra,* 391 F.2d at 147–48. Accordingly, if the failure of the government to produce the confidential files was deliberate or the result of gross negligence, the appellants would be entitled to a new trial.

On the other hand, we are not persuaded that the evidence contained in the confidential file is so material that a new trial is called for if the failure to disclose was merely negligent or inadvertent. There was ample ammunition for attacking Valdez' credibility. Although the particulars of Valdez' background as revealed in the file were not detailed, the jury was apprised of his earlier guilty plea, sentence to probation, and continued cooperation with the government as a paid informant, including a

payment of $1500 in connection with this case.[4] From these facts it was clear that Valdez may have been prompted by more than merely a sense of civic duty. Furthermore, since the defense assumed at trial that Valdez was still on probation—which was not true since the probation had been prematurely terminated nearly eight months prior to trial—the defense was able to say in summation that Valdez was "still under the thumb of the government." (A.603). In fact, by the time of trial in March 1974, Valdez no longer had any direct motive to fabricate his testimony, and the defense therefore received the benefit of an inference that would not have been available had the existence of the confidential file come to light earlier.

The significance of the timing of the sentence and the probation condition of continued cooperation with the government, are largely negated by the fact that Valdez' contacts with Morell and Bruzon and discussions of a possible cocaine sale began in April 1972, several weeks before the sentencing. Furthermore, it is not clear that Valdez was even aware of the condition. He testified that he knew of no condition, and nothing in the confidential file contradicts that statement. No mention of such a condition was made during the sentencing proceedings and such a stipulation was not made a part of the record, although the sentencing judge apparently at some point told a BNDD agent that he would put it in writing if that became necessary.

Finally, even if the trial judge were to allow a wide-ranging cross-examination into the details of Valdez' previous cases, which seems doubtful, the fact that Valdez' *modus operandi* differed in this case from his prior ones would at least be counterbalanced by the evidence that Valdez had established a strong record as a reliable and productive informant.

---

4. The confidential file indicates that the payment of $1500 was "for services rendered." (S.A. 32). Valdez testified that the $1500 included his expenses for working on the case, but a review of his testimony does not show that he stated that the entire amount was for expenses. (A.351–52).

In short, under all the circumstances, we do not think that there is a "significant chance" that the newly disclosed information would have affected the jury's verdict and hence mandates a new trial if the failure to disclose was the result of inadvertence or negligence. The result of our conclusions is that this case must once again be remanded to the district court with directions to hold an evidentiary hearing for the purpose of examining the government's conduct with respect to this material. If the district court finds that the failure to disclose this material was deliberate or the result of gross negligence on the part of the government, it should order a new trial. If, however, the failure was simply inadvertent or negligent, a new trial would not be required.

It should be added that there is presently no indication that anyone in the United States Attorney's Office was aware of the confidential file prior to trial. The immediate disclosure of its evidence to this court on December 11, 1974, negates any such inference. The same cannot be said for Agent McElroy, however. He was the individual who supervised Valdez and in that capacity maintained the confidential file on him. While the prosecutor cannot be charged with the failure to produce information in the possession of any government official, in this case it seems fair to view McElroy as an arm of the prosecutor. Cf. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Rosner, supra,* 516 F.2d at 278–279, n.4; *United States v. Sperling,* 506 F.2d 1323, 1333 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). He not only supervised Valdez and participated actively in this investigation, but also was present at counsel's table throughout all or most of the trial, indicating that he was intimately involved in the prosecution. McElroy may or may not have heard or been aware of the defense's requests for information. That is a matter for the district court to explore on remand, and we should think that the testimony of McElroy would be highly important.

## II.

After a hearing, the district court denied a defense motion to suppress the cocaine seized by government agents at the time of the arrests. The appellants raise two objections relating to the seizure. They contend first that the government was required to secure a warrant before entering the premises and second, that the agents failed to comply with 18 U.S.C. § 3109[5] by not announcing their authority and purpose prior to entry.

It is not disputed that once inside the apartment Agent Scharlatt discovered the cocaine in plain view as he was returning upstairs from the basement. However, the appellants contend that the "plain view" exception to the warrant requirement is inapplicable in this case because the discovery of the heroin was not inadvertent, as the plurality opinion in *Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), requires. Apart from any question as to the precedential force of the plurality opinion, *see United States v. Santana,* 485 F.2d 365, 369–70 n.8 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974), this contention is without merit. As this court observed in *United States v. Lisznyai,* 470 F.2d 707, 710 (2d Cir. 1972), *cert. denied,* 410 U.S. 987, 93 S.Ct. 1516, 36 L.Ed.2d 184 (1973), *Coolidge* dealt with a *planned* warrantless seizure. The *Coolidge* plurality's inadvertence requirement does not apply to cases where the prime motivation of an entry is to appre-

5. The statute provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

hend persons whom the police have probable cause to arrest. In this respect, *United States v. Artieri,* 491 F.2d 440 (2d Cir.), *cert. denied, United States v. Gonzales,* 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 670, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974), is on all fours with this case. In *Artieri,* an undercover informant told the police that Artieri and a man named Gonzales were to divide a quantity of heroin. The informant disclosed that this operation was to take place at Gonzales' residence. While being observed by the police, the informant met Artieri and accompanied him to Gonzales' home. After they had been inside for a while, the informant gave a prearranged signal that the heroin was being cut and bagged. At that point the agents moved in and entered the premises. They found Artieri upstairs, and the heroin was observed to be on a table. Reversing the district court's grant of a motion to suppress, this court stated:

> The purpose of the entry was to arrest those whom the agents had probable cause to believe were in illegal possession of narcotics. The seizure was amply justified by the fact that the contraband was right in front of the defendants, and within their easy reach.

491 F.2d at 443. Although the court sustained the seizure as incident to arrest, it could just as well have relied on the plain view doctrine. The important point was that the prime motivation for the entry was the apprehension of Artieri, who had been described by the informant as a big heroin dealer in Willimantic.

Likewise, here the principal motive of the agents was to arrest Morell and Bruzon, whom "Louie" had described to Valdez as being in the cocaine business. Because of the signal given by Valdez, the agents were reasonably certain that cocaine was on the premises, but so also were the police in *Artieri* aware that there was heroin in Gonzales' residence. Before making the arrests of Morell and Bruzon, the agents were entitled to wait

until such time as events had proceeded to the point where the agents could be reasonably certain that the available evidence would ultimately support a conviction. This seems to us to have been simply a matter of good police practice.

■ The second issue relating to the entry into the store advanced by the appellants has to do with whether the agents complied with 18 U.S.C. § 3109, which requires federal officers to announce their purpose and authority prior to breaking open a door. *See, e. g., Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); *United States v. Artieri, supra.* The question of compliance with section 3109 was raised orally at the suppression hearing, but the court did not decide whether the door was open (a possible inference, since the agents closely followed Valdez into the store after he had removed the $48,000 from the trunk of his car), thus making announcements of purpose and authority unnecessary, or, assuming the door was closed, whether the agents complied with section 3109. The district court apparently accepted the government's contention advanced at the hearing (and here on appeal) that compliance with section 3109 was not required because Valdez, a government informant was already inside and therefore no privacy interest was invaded by the entry of the other agents. *See United States v. Hutchinson,* 488 F.2d 484 (8th Cir. 1973), *cert. denied, United States v. Ennis,* 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974) (undercover government informant was inside the residence, left briefly, and returned with other agents); *United States v. Bradley,* 455 F.2d 1181 (1st Cir. 1972), *aff'd on other grounds,* 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973) (government undercover agent already inside the dwelling when other agents entered). However, we need not pass on the merits of the government's argument. Because we must remand for findings on the question of the government's failure to disclose the contents of the confidential file on Valdez kept by

the Drug Enforcement Administration, we think that it would be best if the district court also determined whether the door was still open when the agents arrived and, if not, whether the agents announced their purpose and authority as section 3109 requires.

## III.

■ We find no merit in the appellants' other contentions. They argue that the prosecution's summation was testimonial in nature and improper in that it told the jury that Valdez came from Central America to testify voluntarily, without threat or promise, or under compulsion by the government. However, the prosecutor was merely drawing inferences from the evidence adduced at trial, and we find no error in the statement. *See United States v. Dibrizzi,* 393 F.2d 642, 646 (2d Cir. 1968).

■ The trial judge also did not rule improperly in refusing to compel the government to disclose the identity and whereabouts of "Louie." While the government's privilege to refuse to disclose the identity of informants is not absolute, the question of disclosure involves "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957); *see United States v. Soles,* 482 F.2d 105 (2d Cir.), *cert. denied,* 414 U.S. 1027, 94 S.Ct. 455, 38 L.Ed.2d 319 (1973). "Louie's" role in this case was only fleeting. He introduced Valdez to Morell and Bruzon as a possible cocaine connection and thereafter disappeared from the scene. His testimony would have added little to the defense case. Furthermore, the request for the informant's name was nothing more than perfunctory. No specific reason for disclosure was advanced to the trial judge. (A.267–68). *See United States v. Casiano,* 440 F.2d 1203, 1205 (2d Cir.), *cert. denied,* 404 U.S. 836, 92 S.Ct. 123, 30 L.Ed.2d 68 (1971).

For the foregoing reasons this case is remanded to the district court for the purpose of holding an evidentiary hearing to enable it to make the findings of fact and conclusions outlined in parts I and II of this opinion.

FRIENDLY, Circuit Judge (concurring and dissenting):

Although it is always hard to object to a remand for further development of the facts, I see no occasion for a second remand with respect to the Government's failure to disclose evidence in its possession in regard to its chief witness, Valdez. The undisputed facts compel a conclusion that the non-disclosure was culpable and not "merely negligent or inadvertent." While *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), should not be pressed to extremes, such as imputing to an Assistant United States Attorney in Brooklyn knowledge of papers in the files of another in San Francisco, see *United States v. Sperling,* 506 F.2d 1323, 1333 (2d Cir. 1974), *cert. denied* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), Agent McElroy, who had possession of the confidential file on Valdez, was an important part of the prosecution team. He had supervised Valdez, obtained Government funds to pay him, knew all about the Florida sentencing (including the correct date and the judge's statement to a special agent that the granting of probation was conditioned on Valdez' continued cooperation), and sat at the trial table for all or most of the trial. Acknowledging all this, the majority agrees we would be obliged to reverse without further ado if McElroy knew of the defense's requests for information about Valdez. The result should not be different if the prosecutor failed to inform him; this would be an altogether too easy method to evade *Giglio.* Furthermore, the majority does not mention the prosecutor's arbitrary refusal prior to the retrial to telephone the United States Attorney in Florida, as defense counsel requested, in order to get information about what had occurred there. The

opinion likewise does not mention the Government's silence when Valdez was explaining a payment of $1,500, see fn. 4, whereas the file in Agent McElroy's possession at the counsel table showed that during the period beginning in April 1972, one month before Valdez first made contact with Morell and Bruzon, until July 1973, two days after the Government secured an early termination of Valdez' probation, he was paid some $4,600 in ten separate payments, all concluding before the first trial commenced.

Apart from fairness to defendants, we are having to devote far too much in scarce judicial resources to determining the consequences of failures to furnish *Brady* material. See *United States v. Sperling,* supra, 506 F.2d at 1333; *United States v. Rosner,* 516 F.2d 269, 273–74 (2 Cir. 1975); *United States v. Seijo,* 514 F.2d 1357 (2 Cir. 1975), and the many recent cases cited at 1364 n.9. It is high time that United States Attorneys in this circuit took effective means to heed the Chief Justice's admonition in *Giglio,* supra, 405 U.S. at 154, 92 S.Ct. at 766, that, to the extent that requiring the right hand to know what the left hand is doing "places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." This should be particularly easy when, as in this case and many others, the material concerns the prosecution's chief witness. An appellate court is naturally reluctant to reverse on *Brady* grounds after long trials where guilt seems clear and the value of the withheld material is dubi-

ous. But we should never forget Judge Frank's famous remarks about the salutary effect inherent in a reversal and a direction of a new trial, as distinguished from repeated admonitions. *United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 661 (2 Cir.) (dissenting opinion), *cert. denied,* 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946). While the Government may have some difficulty in getting Valdez to return for a third trial, with consequent risk of failing to obtain a conviction, that would reinforce the lesson we need to teach. The republic will not perish if these defendants, who took the step, unusual in a narcotics case, of testifying in their own defense, should go free.

We should also make it clear that there is no merit in so much of the Government's argument concerning 18 U.S.C. § 3109 as turns on Valdez' presence inside the store. *United States v. Bradley,* 455 F.2d 1181 (1 Cir. 1972), aff'd on other grounds, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973), and *United States v. Hutchinson,* 488 F.2d 484 (8 Cir. 1973), *cert. denied, United States v. Ennis,* 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974), are inapposite. In those cases the person who had lawfully entered was a government agent empowered by Federal law to make an arrest, so that the subsequent questionable entry was deemed inconsequential; Valdez, an undercover operator, had no such authority.

I would reverse for a new trial, to be preceded by a suppression hearing on the issue of compliance with 18 U.S.C. § 3109. I concur in other portions of the court's opinion.