464 F.Supp. 164 (1979)
In the Matter of A Motion for the Return of Property Seized Pursuant to Warrant at 2029 HERING STREET, BRONX, NEW YORK.
No. M 9150.
United States District Court, S. D. New York.
January 3, 1979.
*165 George David Rosenbaum, New York City, for Vincent and Barbara Liberti.
Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y., by Mark F. Pomerantz, New York City, for the United States.

MEMORANDUM ORDER
VINCENT L. BRODERICK, District Judge.

I

Introduction
Vincent Liberti and Barbara Liberti, his wife ("applicants"), seek an order directing that certain property, purportedly seized pursuant to a search warrant, be suppressed as evidence and directing that said property be returned to applicants. See Rules 12(b)(3), 41(e), 41(f), Fed.R.Cr.P. An evidentiary hearing on applicants' motion was held on August 7, 1978.
Rudy King, who, like Mr. Liberti, was an employee of Saks Fifth Avenue ("Saks"), informed Postal Inspector James J. Boyle that King had mailed packages to the Liberti home for approximately one year. Except for two packages, the contents and dates of mailing of such packages were unknown. It was known that one such package was mailed on June 23, 1978, but the contents of that package were unknown. A second package, mailed on June 29, 1978, was known to consist of a single brown box containing Estee Lauder cosmetic gift boxes. Inspector Boyle was advised by an Assistant United States Attorney that probable cause existed only as to that single box. Accordingly, a search warrant was sought by Inspector Boyle and issued by the magistrate with respect to only that one brown box.

II

The Search Warrant
On July 10, 1978 Magistrate Leonard Bernikow issued a search warrant for the residence of Vincent and Barbara Liberti at 2029 Hering Street, Bronx, New York, on the basis of an affidavit by Inspector Boyle that he had reason to believe that "there is now being concealed certain property, namely one (1) brown cardboard box addressed to Mrs. Barbara Liberti, containing *166 Estee Lauder cosmetic gift boxes, which are believed to constitute evidence of violations of Title 18, United States Code, Section 1341."[1]
The affidavit of Inspector Boyle set forth that he had, for several weeks, been investigating possible mail fraud violations by Saks employees; that he had been informed by a Saks corporate security employee that the addressees of brown cardboard boxes prepared for mailing in Saks' delivery department and lacking invoices or other documentation were frequently the wives of Saks supply room or delivery room employees; and that several of such boxes, examined before delivery, were found to contain clothes, cosmetics, and other Saks property and merchandise. The affidavit stated that postal authorities had informed Boyle that a brown cardboard box addressed to Mrs. Liberti had been delivered to her at 2029 Hering Street, Bronx, on June 29, 1978, and that the Saks corporate security employee had told him that the box contained Estee Lauder gift boxes belonging to Saks. The affidavit identified Vincent Liberti as an employee of Saks who lived at 2029 Hering Avenue.

III

Execution of the Search Warrant
Prior to the execution of the warrant, Inspector Boyle had a conversation with Postal Inspector O'Brien, who was an attorney and was in charge of the execution of the search warrant. Boyle told O'Brien that items other than the single box listed in the warrant could be seized if such other property was not properly in the Liberti residence. However, Boyle also told O'Brien that when the matter listed in the search warrant was found, the search was to cease.
Four persons executed the search warrant: Inspector O'Brien, Postal Inspector Neil Schorr, Postal Inspector Carole Cassidy, and James Burger, the security operations manager for Saks. Burger participated in the execution of the warrant for the purpose of identifying any Saks merchandise found in the Liberti home.
On July 10, 1978, at about 3:20 to 3:30 p. m., the three postal inspectors and Mr. Burger approached the Liberti residence. O'Brien rang the doorbell. The Liberti's son, 12 or 13 years old, responded, stated that his parents were not at home, and summoned his grandmother, Mrs. Lonacchio, who lived upstairs in a separate residence. Inspector O'Brien introduced the group to Mrs. Lonacchio and informed her that their purpose was to execute a search warrant. She became upset and refused them entry. Inspector O'Brien explained that they had a court order and had a right to be there, but that they would appreciate it if Mrs. Lonacchio would be there as a witness while the warrant was executed.
Mrs. Liberti then returned home and was presented with the warrant. She too initially refused entry and was very upset. But she allowed admittance when Inspector O'Brien informed her that the search warrant was a court order and that he did not need her consent.
Mrs. Lonacchio was present throughout the entire search. Mrs. Liberti consistently denied having any of the items listed on the warrant, and in fact those items were never found.
*167 During the search of the living area of the house Mrs. Liberti walked to a hallway closet, opened the closet door, and stated, "This is all I have." Numerous boxes were on the top shelf of the closet. Certain of the boxes were unmarked, while others were clearly marked as cosmetics. Burger identified the boxes as containing merchandise sold by Saks. The boxes were seized.
After having searched the living area, the inspectors asked if there was a basement, and Mrs. Liberti pointed to a door. The basement was an area used in common by the Libertis and the Lonacchios.
The inspectors also asked if they could search the unattached garage. Mrs. Liberti told him that she and her family had no access to the unattached garage and that the garage belonged exclusively to her mother and father.[2] Inspector O'Brien then asked Mrs. Lonacchio if she would permit a search of the garage. She agreed to the search.
Inspectors O'Brien, Schorr, and Cassidy then proceeded to search the remainder of the Liberti's apartment, the basement, and the garage. Numerous boxes, tote bags, and cartons were discovered and seized.

IV
Applicants argue that the search and seizure exceeded the scope of the search warrant and that, therefore, the search and seizure were unconstitutional under the Fourth Amendment.
The Government contends that the search and seizure were lawful. In support of its contention, the Government relies in part on the "plain view" exception to the Fourth Amendment warrant requirement and in part on the doctrine of consent. The Government argues that the "plain view" doctrine validates the seizure of all the items that were found in applicants' apartment and in the basement. The Government argues that the seizure of the items that were found in the unattached garage was validated by a consent to the search of the garage. The Government contends that the consent was given by Mrs. Liberti's mother as the owner of the garage.
For the reasons stated below, I find that applicants are entitled to an order directing that all of the seized property be suppressed as evidence against applicants in any criminal proceeding, but are not entitled to an order directing the return of the seized property to applicants.

V

Motion to Suppress

Plain View Exception
To validate the seizure of the property found in the applicants' apartment and in the basement of their building, the Government relies on the "plain view" exception to the Fourth Amendment warrant requirement.[3]
The leading case on the "plain view" exception is Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, rehearing denied, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971). The "plain view" issue in Coolidge was whether the warrantless search and seizure of Coolidge's car could be validated on the theory that the car was an instrumentality of a crime and thus legally seizable by the police, who were effecting a lawful arrest, because the car was in plain view. 403 U.S. at 464, 91 S.Ct. 2022. The Court held that the "plain view" exception did not validate the seizure of the car. Id.[4]
The Court found that the "plain view" exception is applicable only in limited circumstances:

*168 It is well established that under certain circumstances the police may seize evidence in plain view without a warrant. But it is important to keep in mind that, in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the "plain view" doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.
* * * * * *
What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused.
Id. at 465-66, 91 S.Ct. at 2037-2038.
Thus under Coolidge the "plain view" exception applies only to situations in which a government agent (1) with a prior justification for an intrusion (2) inadvertently discovers (3) a piece of evidence that incriminates the accused.
The key requirement, so far as the instant case is concerned, is the requirement that the discovery be inadvertent. Coolidge emphasized that whether or not this requirement is met depends on what the government agents expect to find in their search:
[A] plain-view seizure will not turn an initially valid (and therefore limited) search into a "general" one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as "per se unreasonable" in the absence of "exigent circumstances."
If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of "Warrants . . . particularly describing . . . [the] things to be seized." . . . [T]o extend the scope of such an intrusion to the seizure of objectsnot contraband nor stolen nor dangerous in themselves which the police know in advance they will find in plain view and intend to seize, would fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure.
Id. at 470-71, 91 S.Ct. at 2040-2041 (emphasis added).[5]
In this case, the "plain view" exception does not validate the seizures because the inspectors' discovery of evidence not specified in the warrant was not inadvertent. See id.
Inspector Boyle knew that packages had been mailed to the Liberti home from Saks for approximately one year. He believed that items other than the matter specified in the warrant would be found, and in fact he ordered the other inspectors to seize such items if found.
Inspector Schorr went into the Liberti home intending to seize any and all cosmetics he could find. At the Liberti home he was engaged in a general search for cosmetics. Inspectors O'Brien and Cassidy possessed an intent not so broad as Schorr's *169 but certainly broader than an intent to seize merely the matter specified in the warrant.
That the discovery of other evidence was not inadvertent but anticipated is also evidenced by the presence of James Burger, the Saks agent, during the execution of the search warrant. Burger was present in order to be able to identify as Saks goods any goods that were found. Because the matter specified in the search warrant was sent to applicants' residence in a readily identifiable package, the contents of which package were also readily identifiable (as Estee Lauder cosmetic gift boxes), it is clear that Burger was present to identify other items, not specified in the search warrant, that the postal inspectors expected to find.[6]
Application here of the "plain view" exception would be especially inappropriate because the Government deliberately presented only limited evidence to the magistrate in procuring the search warrant. Despite the inspectors' knowledge that packages from Saks had been mailed to the Liberti home for at least one year and despite the inspectors' strong belief that cosmetics items other than those named in the warrant would be found in the Liberti home, the inspectors presented the magistrate with specific evidence only pertaining to, and a request for a warrant only with respect to, the June 29, 1978 box. To approve such a search warrant, and to validate a general seizure thereunder, would be to find, in practical effect, that the "plain view" doctrine has reinstated and validated the general warrant. To approve such a warrant would encourage law enforcement officers to seek search warrants for the limited purposes of access to otherwise forbidden premises; once government agents obtained access to the subject premises, the agents could invoke the "plain view" doctrine to make any pickings fair game.
Here the initial presentation to the magistrate was carefully circumscribed, upon the advice of an Assistant United States Attorney that probable cause existed only as to the single package described. Certainly law enforcement officers should be encouraged to seek prosecutorial advice with respect to the parameters of probable cause. But there is something amiss and violative of the mandate of Coolidge when the prosecutor narrowly circumscribes the scope of an application for search warrant (and hence the scope of the search warrant itself), and then the law enforcement officials, whether on advice of the prosecutor or on their own, act on the principle that the "plain view" exception removes any such circumscription and permits the executing agents to seize any and all matter found in the premises searched. See United States v. Campbell and Tartt, 581 F.2d 22, 27 n.9 (2d Cir. 1978) ("We do not suggest that an Assistant U. S. Attorney possesses the neutrality and detachment of a judicial officer, Johnson v. United States, 333 U.S. 10, 13-14, [68 S.Ct. 367, 92 L.Ed. 436] (1948), or that the procedure described in this opinion [which was a consultative procedure similar to that used herein] could possibly satisfy the warrant requirement.").
In Coolidge the New Hampshire Attorney General, who had actively investigated the crime and who was later the chief prosecutor, signed the search warrant in his capacity as a justice of the peace. The Court concluded that in light of these facts, "the search stands on no firmer ground than if there had been no warrant at all." 403 U.S. at 453, 91 S.Ct. at 2031. This conclusion was based on a "per se rule of disqualification," id. at 450, 91 S.Ct. 2022, 2029, against a law enforcement officer's acting as a judicial officer in regard to the issuance of a search warrant: "prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigationsthe `competitive enterprise' that must rightly engage their single-minded attention." Id. (footnote omitted).
The case before me presents the next logical step in the attempted circumvention of the warrant requirement of the *170 Fourth Amendment. Although the warrant in this case was signed by a magistrate, the Government precluded a full and fair finding of probable cause by unilaterally making a prior determination that probable cause existed as to only the June 29, 1978 package; and the Government did this despite facts in the Government's possession leading to the Government's belief that other cosmetics items would be found and despite an intent to seize such items.
The Government's actions in obtaining and executing the warrant were inconsistent with the relevant principles announced in Coolidge. The "plain view" exception does not apply here.
This conclusion is not inconsistent with the cases cited by the Government.
United States v. Pacelli, 470 F.2d 67, 71 (2d Cir. 1972), cert. denied, 410 U.S. 983, 93 S.Ct. 1501, 36 L.Ed.2d 178 (1973), invoked the plain view exception to uphold the seizure of evidence as to which the government agents had no prior knowledge and which the agents had no intent to seize prior to its being found.
United States v. Campanile, 516 F.2d 288, 291 (2d Cir. 1975), applied the plain view exception to validate the seizure of "evidence discovered by chance in the course of a lawful search . . .." (emphasis added).
United States v. Rollins, 522 F.2d 160, 166 (2d Cir. 1975), cert. denied, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976), held that the plain view exception was applicable in part on the basis of the finding that "[t]here is no evidence to indicate that the police had prior knowledge of the [seized evidence] or [its] location, nor of any intent to seize them prior to their discovery."
United States v. Morell, 524 F.2d 550 (2d Cir. 1975), and United States v. Montiell, 526 F.2d 1008 (2d Cir. 1975), are also distinguishable. In Morell the Court distinguished Coolidge by stating that Coolidge's "inadvertence requirement does not apply to cases where the prime motivation of an entry is to apprehend persons whom the police have probable cause to arrest." 524 F.2d at 555-56. No such motivation was involved in this case. In Montiell the Court followed Morell in distinguishing Coolidge and also noted the presence of "exigent circumstances," 526 F.2d at 1010, which removed the need for the agents to obtain warrants. Therefore, evidence seized in plain view was held admissible even though the agents anticipated that the evidence would be present and intended to seize it. Here, there were no exigent circumstances that precluded the postal inspectors from obtaining a warrant that covered the disputed items.
In United States v. Diaz, 577 F.2d 821, 824 (2d Cir. 1978), the court, relying on the plain view exception, explicitly found that "[t]he requirement of inadvertence is clearly satisfied."
In United States v. Auterbridge, 375 F.Supp. 418 (S.D.N.Y.1974), the court, in an alternative holding, relied on the plain view exception to validate a seizure. The court cited Pacelli, supra, and Coolidge, in support of that holding and thereby implied its recognition of the Coolidge inadvertence requirement.[7]

*171 Consent

The Government argues that Mrs. Liberti and her mother, Mrs. Lonacchio, consented to the search of the unattached garage and that, therefore, the property seized in the garage is admissible. I do not agree.
In Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 717 (1968), the Supreme Court held that there can be no valid consent when the "consent" is given only after the officer has asserted that he has a warrant:
The issue thus presented is whether a search can be justified as lawful on the basis of consent when that "consent" has been given only after the official conducting the search has asserted that he possesses a warrant. We hold that there can be no consent under such circumstances.
When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. . . .
When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion  albeit colorably lawful coercion. Where there is coercion there cannot be consent.
Id. at 548-50, 88 S.Ct. at 1791-1792 (emphasis added; footnotes omitted).
In Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Court held that whether or not a consent was voluntarily given and hence valid is a question of fact to be determined from the totality of the circumstances; thus a consent that is in any way coerced is not a valid consent:
[T]he question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. . . .
* * * * * *
But the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.
Id. at 227-28, 93 S.Ct. at 2047-2048. Accord, United States v. Diaz, 577 F.2d 821, 823 n.2 (2d Cir. 1978).
The Court in Schneckloth indicated a particular sensitivity to any police coercion, however subtle, and to the subjective state of mind of the person who consents:
[I]n examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. . . .
* * * * * *
. . . [I]f under all the circumstances it has appeared that the consent was not given voluntarily  that it was coerced by threats or force, or granted only in submission to a claim of unlawful authority  then we have found the consent invalid and the search unreasonable. [citing Bumper, supra].
412 U.S. at 229, 233, 93 S.Ct. at 2049, 2051 (emphasis added).
*172 The issue is whether Mrs. Lonacchio's "consent" comports with the constitutional requirements of Bumper and Schneckloth. I find that it does not.
When the four postal inspectors and Mr. Burger arrived, Mrs. Lonacchio was initially presented with the warrant. She was very upset and shocked, and initially she refused entry to the Liberti home. She was told her consent was not needed because the warrant was a court order. After Mrs. Liberti had returned, the search was begun and Mrs. Lonacchio was present for the entire search. She was present when the basement, of which she and her husband were co-users, was searched and when items found there were seized.
Under the totality of the circumstances, I find that her consent to search the garage was not voluntary and hence was not a legally valid consent. An average layperson, having been caught in the midst of a search of the property of a close relative, having seen her own property searched, and having been told earlier that her consent was not needed because the warrant was a court order, could only surmise that her "consent" to a further search was a mere formality. Mrs. Lonacchio did no more than submit to a claim of lawful authority. Schneckloth v. Bustamonte, supra, 412 U.S. at 233, 93 S.Ct. 2041. There was no free and voluntary consent. "The situation [was] instinct with coercion . ., [and] where there is coercion there cannot be consent." Bumper, supra, 391 U.S. at 550, 88 S.Ct. at 1792.
The Government has argued that applicants may not have standing to seek the suppression of the evidence seized in the basement and the garage.[8] In their supporting affidavit, dated July 20, 1978, applicants have stated that the basement and the garage were in the exclusive possession of Mrs. Liberti's parents. Affidavit ¶ 5. The Government argues that, in light of this statement and in light of the statement that applicants have standing because they are "the lawful owners" of the seized property, id., the Government is entitled to have the affidavit struck because Mr. Liberti, who signed the affidavit, was unwilling to submit to cross-examination at the hearing concerning his claim of "lawful ownership" of the property.
The Government's motion to strike is denied. The affidavit also states that "the property was in the possession of the movants at the time it was seized." Id. ¶ 6. Although cross-examination might have undermined applicants' claim to "lawful ownership," I find that cross-examination would not have altered the fact that the property was in the possession of applicants. Mr. Liberti's unwillingness to undergo cross-examination on his affidavit statements therefore did not prejudice the Government.[9]

*173 Motion for Return of Property

Applicants have moved for an order directing that the illegally seized property be returned to them on the ground that they are entitled to lawful possession of that property. See Rule 41(e), Fed.R.Cr.P.
I have received evidence on the issues of fact necessary to the decision of this motion, see id., and I find that the motion must be denied.
The evidence presented at the hearing tended to show that the seized property may have been the fruit of an illegal scheme. As such, that property is presently subject to lawful detention and will not be returned to applicants at this time. E. g., United States v. Margeson, 259 F.Supp. 256, 272 (E.D.Pa.1966).[10]
SO ORDERED.
NOTES
[1] 18 U.S.C. § 1341 (1970) provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
[2] Thus it is clear that Mrs. Liberti did not consent to the search of the garagevoluntarily or otherwise. See infra at 171-172.
[3] Applicants argue that the basement was not a part of the premises identified in the warrant as the place to be searched. I find otherwise. The basement is used by applicants for storage, and the only indoor access to the basement is from the applicants' apartment. Thus, under United States v. Canestri, 518 F.2d 269, 273-74 (2d Cir. 1975), the basement was within the scope of the search warrant.
[4] Only four justices joined in this part of the opinion. Id. at 445, 91 S.Ct. 2022.
[5] Coolidge established the limitations on the "plain view" exception as that exception applies to objects "not contraband nor stolen nor dangerous in themselves." Id. at 471, 91 S.Ct. at 2041. In this case the Government does not contend that the Coolidge limitations on the exception do not apply herein because the seized items were stolen. Nor does the Government cite any cases that hold that the Coolidge limitations do not apply under such circumstances. Indeed, any such holding would be troublesome because it would allow the Government, in cases involving alleged theft, to rely on a fact to be established at trial (that the property was stolen) in order to validate a disputed search and seizure at a pre-trial motion to suppress.
[6] Inspector Boyle, on advice of counsel, neglected to share this expectation with the magistrate who issued the warrant. See infra.
[7] As a sequel to its earlier determination that probable cause existed as to only the package mailed on June 29, 1978, the Government now argues that the property actually found and seized was in fact found "inadvertently" in the relevant sense because the Government did not know in advance of the seizure exactly what property other than the June 29th package would be found.

There are two responses to this argument. First, the cases suggest that the fact that the Government knew that certain types of property would probably be found suffices to render the discovery of the specific items of property not "inadvertent." Cf. United States v. Auterbridge, 375 F.Supp. 418, 420 (S.D.N.Y.1974) ("`When circumstances make an exact description of instrumentalities a virtual impossibility, the searching officer can only be expected to describe the generic class of items he is seeking.'") (quoting James v. United States, 416 F.2d 467 (5th Cir. 1969), cert. denied, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970)). Second, even if the standards regarding "inadvertence" were more favorable to the Government's position, the Government's argument would still lack force because the Government failed in the first instance to present to the magistrate whatever evidence it had regarding the other property so that he could make the constitutionally required determination that probable cause did or did not exist as to that other property. If the Government had done so, this might be a different case. But the Government cannot now be permitted to validate the seizure of property by the mere expedient of an invocation of the plain view exception and an ex post facto claim that the Government did not know the details of the identity of the property that it expected to seize.
[8] In light of my finding that the basement was an area used in common by applicants and the Lonocchios, see supra at 167 and n.3, I reject the Government's standing argument so far as that argument pertains to the seizures made in the basement.
[9] The Government's motion to strike is based on the Government's standing argument. That argument, which was a plausible one when made, has now lost much of its force because of the decision in Rakas v. Illinois, ___ U.S. ___, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), wherein the Court questioned whether the concept of standing should continue to be considered an issue, distinct from and precedent to a ruling on the merits of a Fourth Amendment claim: "[W]e think the better analysis forth-rightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." Id. at ___, 99 S.Ct. at 428. Rakas states that a court should proceed directly to the inquiry of "whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Id. at ___, 99 S.Ct. at 429.

In light of Rakas, therefore, I presume that the Government would now contend that its motion to strike is based not on a standing argument but on an argument that Mr. Liberti did not have a "legitimate expectation of privacy," id., in the garage. However, in light of the family relationship between Mr. Liberti and the Lonocchios, the owners of the garage, and in light of Mr. Liberti's claim of a possessory interest in the items seized in the garage, cf. id. at ___, 99 S.Ct. 421, I find such an argument unconvincing.
[10] Applicants may, of course, initiate any appropriate legal proceeding to establish their title to the seized property.